In the Matter of the Extradition of John DEMJANJUK, a/k/a John Ivan Demjanuk, a Fugitive From the Justice of Israel.

Misc. No. 83–349.

United States District Court,
N.D. Ohio, E.D.

March 15, 1984.

Gary Arbeznik, Asst. U.S. Atty., Cleveland, Ohio, Murray Stein, Alvin Lodish, U.S. Dept. of Justice, Washington, D.C., for petitioner.

Mark J. O'Connor, Buffalo, N.Y., John J. Gill, Cleveland, Ohio, for respondent.

## MEMORANDUM OPINION AND ORDER

BATTISTI, Chief Judge.

Before the Court is Respondent's Motion for Recusal.[1] Respondent bases his Motion on the Fifth Amendment to the United States Constitution, 28 U.S.C. §§ 144[2] and 455[3] and Canon 3[4] of the ABA Code of

---

1. Without an understanding of the checks and balances that operate to insure a just determination of a recusal motion, one might question the efficacy of a procedure whereby the judge who is the subject of such a motion is left to rule on its sufficiency. Most courts have not been squarely faced with a challenge to the procedure. However, at least one court has seen fit to comment extensively on the reasons behind it. The court in *United States v. Zagari*, 419 F.Supp. 494, 498–499 (N.D.Cal.1976), expressing its support for the current manner of disposing of recusal motions, remarked as follows:

> Some of the reasons that have been given for the rule allowing the judge being questioned to pass on the legality of the motion are that otherwise the disqualification procedure could be used as a tool for delay and disruption of the administration of the courts, and that such judge knows better than anyone else whether he could give the parties a fair and impartial trial.

Although courts have been known to seek the reassignment of a matter to another judge for purposes of resolving recusal motions, *see United States v. Zagari*, 419 F.Supp. at 497, such action is by no means typical or required to insure a just ruling on such motions. *See United States v. Olander*, 584 F.2d 876, 883 (10th Cir.1978), *vacated on other grounds*, 443 U.S. 914, 99 S.Ct. 3105, 61 L.Ed.2d 878 (1979). Confident that it can and will reach a just determination without endangering the Court's appearance of impartiality, this Court will follow the practice recognized by most of the federal courts that have been faced with recusal motions. That parties may seek appellate review of this Court's ruling on the question of recusal doubly insures a just determination of the issue raised in Respondent's Motion. *See, e.g., City of*

*Cleveland v. Krupansky*, 619 F.2d 576 (6th Cir. 1980), *cert. denied*, 449 U.S. 834, 101 S.Ct. 106, 66 L.Ed.2d 40 (1980); *Rosen v. Sugarman*, 357 F.2d 794 (2d Cir.1966); *United States v. Zagari*, 419 F.Supp. 494.

2. Section 144 reads in pertinent part as follows:
BIAS OR PREJUDICE OF JUDGE
 Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.
 The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

3. Section 455 reads in pertinent part as follows:
DISQUALIFICATION OF JUSTICE, JUDGE, OR MAGISTRATE
 (a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
 (b) He shall also disqualify himself in the following circumstances:
 (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

\* \* \* \* \* \*

Judicial Conduct. Respondent alleges that this Court harbors a personal bias against him and his counsel and favors the Government, and the State of Israel, the party whose interests the Government represents.[5] Respondent maintains that, because this Court is not impartial, he would be denied his right to a fair trial were he required to try his case before this Court.

In support of his February 23, 1984 Motion, Respondent has submitted for the Court's consideration an affidavit executed by Respondent's counsel attesting to the fact that the Motion is made in good faith. Respondent's counsel also affirmed that they furnished Respondent with the information recited in a second affidavit executed by Respondent and submitted to the Court. In his own affidavit, Respondent attempts to articulate the factual basis for his belief that the Court is biased with regard to the instant matter and that the Court can neither impartially preside over these extradition proceedings in an unbiased manner, nor with an appearance of impartiality.[6] On March 2, 1984, the Government submitted to the Court its brief in opposition to Respondent's Motion. Respondent submitted a reply to the Government's brief on March 7, 1984.

The Court took into consideration all of the memoranda submitted by both parties in arriving at its decision. In addition, because of the unique nature of the case and the seriousness of the particular charges of bias put forth by Respondent, the Court has seen fit to review, and take into consideration, portions of the record from the 1981 denaturalization proceeding over which this Court presided, Respondent's Motion to Vacate Judgment,[7] filed on October 23, 1983 on behalf of John Demjanjuk, Respondent in the instant matter, and supplemented on October 28, 1983, all the documents filed by the parties and the orders issued by this Court in connection with the pending extradition matter, as well as the transcript from the February 9, 1984 prehearing conference at which counsel for both parties, the *amicus curiae* and the Court were in attendance.

## I.

In 1977, the United States brought an action under the Immigration and Nationality Act to revoke the certificate of naturalization of John Demjanjuk. The Government alleged that Demjanjuk, who became a citizen of the United States on November 14, 1958, had illegally procured his citizenship by concealing and/or misrepresenting material facts regarding his service with German SS and military personnel during World War II.

In its June 23, 1981 Memorandum Decision and Order, this Court, having found that Demjanjuk had illegally procured his naturalization, revoked his citizenship. *United States v. Demjanjuk*, 518 F.Supp.

---

**4.** Relevant portions of Canon 3 read as follows:
... C. *Disqualification*
 (1) A judge shall disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:
 (a) He has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;
 * * * * * *

**5.** In accordance with the United States/Israel Extradition Treaty under which the State of Israel currently seeks Respondent's extradition, the United States government is representing the Israeli government in this federal district court on its petition for extradition. A review of the documents thus far filed by the Government reveals that some of the Government attorneys working on this extradition matter are from the Office of International Affairs ("OIA"). The OIA functions as one of many sections of the United States Department of Justice. Government attorneys from the Office of Special Investigations ("OSI") and the United States Attorneys office in Cleveland are also involved in the matter. Neither the OSI nor the OIA, in and of themselves, are "parties" to the instant litigation. Rather, they are all Government counsel representing the interests of the State of Israel.

**6.** Both Respondent's affidavit and that of his attorneys are attached to this Memorandum Opinion and Order as Appendix A.

**7.** Nowhere in his original Motion to Vacate Judgment, or in the supplement to that Motion, does Respondent move this Court to recuse itself.

1362 (N.D.Ohio 1981). In arriving at its final determination, the Court made numerous findings of fact. Those findings were based on testimony and documentary evidence offered by both parties regarding Demjanjuk's wartime activities. *United States v. Demjanjuk*, 518 F.Supp. at 1363–80. On appeal, the Sixth Circuit affirmed this Court's decision. The Supreme Court subsequently declined to review the matter. *United States v. Demjanjuk*, 518 F.Supp. 1362 (N.D.Ohio 1981), *aff'd*. 680 F.2d 32 (6th Cir.1982), *cert. denied*, 459 U.S. 1036, 103 S.Ct. 447, 74 L.Ed.2d 602 (1982).

Two years after its final determination in the aforementioned denaturalization proceeding, the Court considered Demjanjuk's Motion to Vacate Judgment. In its decision to deny Demjanjuk's Motion, the Court reviewed, among other things, recently prepared affidavits of two men who had testified as Government witnesses at the 1981 denaturalization proceeding. Demjanjuk had submitted the affidavits with his Motion. The Court compared the affidavits with portions of the original trial transcript wherein the affiants' former testimony had been recorded. *United States v. Demjanjuk*, 101 F.R.D. 680 (N.D.Ohio 1983). Currently, the Court's November 28, 1983 Order is on appeal to the Sixth Circuit.

While the Court had Demjanjuk's Motion to Vacate Judgment under advisement, the State of Israel, through its representative, the United States government, instituted the above-captioned action for the extradition of Demjanjuk pursuant to an extradition treaty between the United States and Israel. *See* Request for Extradition, filed November 18, 1983. Under the assignment system employed in the Northern District of Ohio, the matter was assigned to this Court for supervision and resolution as a related matter. Rule 7.09 of the Rules of the United States District Court, the Northern District of Ohio, covers the system of assignment employed in the instant matter.[8] Both the denaturalization and the extradition matters involve some of the same parties and arose out of the same events.

## II.

■ It has long been recognized that freedom of a tribunal from bias or prejudice is an essential element of substantive due process accorded litigants under the Fifth Amendment. *See United States v. Sciuto*, 531 F.2d 842 (7th Cir.1976); *Knapp v. Kinsey*, 232 F.2d 458, 465 (6th Cir.1956), *cert. denied*, 352 U.S. 892, 77 S.Ct. 131, 1 L.Ed.2d 86 (1956). Under 28 U.S.C. §§ 144 and 455 and Canon 3 of the ABA Code of Judicial Conduct, a judge must preside over a proceeding in an unbiased manner and with the appearance of impartiality.[9] Under the aforementioned statutory provisions, a party seeking the disqualification of a judge "must give fair support to the charge of a bent of mind that may prevent or impede impartiality of judgment." *United States v. Sinclair*, 424 F.Supp. 715, 718 (D.Del.1976), *aff'd*, 566 F.2d 1171 (3d Cir.1977). A moving party must present in its affidavit(s) in support of its recusal motion more than conclusory statements regarding bias or apparent partiality on the part of the presiding judge. The presiding

---

**8.** RULE 7.09 ASSIGNMENT OF CASES OTHER THAN BY LOT.

Cases shall be assigned, other than by lot, only in the instances set forth in this paragraph. Such assignments shall be made by the Clerk under the direction of the Chief Judge.

\*　\*　\*　\*　\*　\*

(4) Cases related to cases already assigned to a judge shall be assigned or transferred to said judge. Related cases are defined as follows:

\*　\*　\*　\*　\*　\*

(c) Civil cases are deemed related when a filed case (i) relates to property involved in an earlier numbered pending suit, *(ii) involves the same issue or issues of fact or grows out of the same transaction or subject matter as a pending civil suit, ....* (Emphasis added.)

**9.** The Fifth Amendment due process right to a fair trial before an impartial trier of fact is codified in sections 144 and 455 and recognized in Canon 3. Authorities have determined that sections 144 and 455 must be construed *in pari materia. See City of Cleveland v. Cleveland Electric Illuminating Company*, 503 F.Supp. 368, 371–72 (N.D.Ohio 1980); *United States v. Zagari*, 419 F.Supp. at 504–5.

judge is presumed to be impartial. The burden is on the moving party to prove otherwise. *United States v. Zagari*, 419 F.Supp. 494, 501 (N.D.Cal.1976).

■ This Court has an affirmative duty to assess the legal sufficiency of the affidavits submitted in support of Respondent Demjanjuk's recusal motion. *City of Cleveland v. Cleveland Electric Illuminating Company*, 503 F.Supp. 368, 369 (N.D.Ohio 1980). "Disqualification results only from the filing of a timely and legally sufficient affidavit." (Citations omitted) *United States v. Sinclair*, 424 F.Supp. at 717. Moreover, a judge has an obligation to continue to preside over a particular matter when he has determined that the parties have failed to put forth valid grounds for recusal. *City of Cleveland v. Cleveland Electric Illuminating Company*, 503 F.Supp. at 370; *United States v. Birrell*, 276 F.Supp. 798, 809 (S.D.N.Y. 1967). The court in *Rosen v. Sugarman*, 357 F.2d 794, 797–98 (2d Cir.1966), summed up the reviewing court's obligation when it declared:

> The mere filing of an affidavit of prejudice does not require a judge to recuse himself. On the contrary, we have held that a judge has an affirmative duty to inquire into the legal sufficiency of such an affidavit and not disqualify himself unnecessarily, ....

### A.

■ The Court must observe certain guidelines when assessing the sufficiency of Respondent's affidavit. For purposes of the Court's inquiry with regard to the legal sufficiency of Respondent's affidavits, "all facts stated with particularity are to be taken as true." *City of Cleveland v. Cleveland Electric Illuminating Company*, 503 F.Supp. at 371. *See also Berger v. United States*, 255 U.S. 22, 36, 41 S.Ct. 230, 234, 65 L.Ed. 481 (1920); *Rosen v. Sugarman*, 357 F.2d 794. To the extent that a party's affidavit(s) contain assertions of bias that are subjective and conclusory

in nature, those affidavits will not support a decision for recusal. A legally sufficient affidavit must include specific objective facts that, reviewed as a whole, would lead a reasonable man to believe that the Court is biased or that the Court's appearance of impartiality is in doubt. As one court put it:

> In order to be legally sufficient the allegations, taken as true, must contain information that is definite as to time and place .... The reasons and facts for the belief the litigant entertains are an essential part of the affidavit, and must give fair support to the charge of a bent of mind that may prevent or impede impartiality of judgment.... (Citations omitted.) *Martelli v. City of Sonoma*, 359 F.Supp. 397, 399 (N.D.Cal.1973), *aff'd*, 556 F.2d 587 (9th Cir.1977).

*See also Roberts v. Bailar*, 625 F.2d 125, 129 (6th Cir.1980); *United States v. Sinclair*, 424 F.Supp. at 718; *United States v. Zagari*, 419 F.Supp. at 501; *Bumpus v. Uniroyal Tire Company*, 385 F.Supp. 711, 715 (E.D.Pa.1974). The reviewing court must weigh the facts set out in the affidavit(s) submitted by the moving party for their legal sufficiency. The court is not restricted to the moving party's evaluation of the sufficiency of the facts:

> While the facts set out in the affidavits must be accepted as true, the judge passing on the legal sufficiency of the affidavit is not required to accept the construction placed on them by the movant or the particular affiant. *United States v. Zagari*, 419 F.Supp. at 501.

In all or parts of paragraphs 2, 3, 4, 6, 7, 9, 10, 12a [10], 13, 15 and 18 of respondent's affidavit in support of his Motion for Recusal, Respondent proffers conclusory statements regarding this Court's alleged bias. The thrust of Respondent's remarks is twofold: (1) that the Court is in collusion with United States, Soviet and Israeli government forces to secure the denaturalization and deportation or the extradition and pros-

---

**10.** Respondent has two paragraphs numbered "12" in his affidavit. For clarity, the Court refers to them in this Memorandum Opinion and Order as 12a and 12b, respectively.

ecution of Respondent, and that the Court has so conspired against Respondent for at least the past seven years; (2) that the Court harbors a personal bias against Respondent's counsel that has transmuted itself into a personal bias against Respondent. Instead of leaving this Court to evaluate individual facts *in toto* to determine whether they reasonably can be construed to mean that the Court is biased or prejudiced, and whether the Court could preside over the extradition proceedings with an appearance of impartiality, Respondent supplies the conclusions that actions the Court has taken with regard to the 1981 denaturalization proceeding, the Respondent's Motion to Vacate the Court's denaturalization order, and the February 9, 1984 conference on the extradition matter currently before the Court, establish that the Court is biased and ought not to preside over the pending extradition proceeding. To the extent that Respondent's affidavit relies on such conclusory statements, it is legally insufficient.

The Court includes herein some examples of the conclusory statements which form the crux of Respondent's affidavit. In paragraph 2 of his affidavit, Respondent remarks as follows:

> 2. I submit this affidavit in support of my motion to have the Honorable Frank J. Battisti disqualified from presiding in this case, on the grounds that he has a personal bias and prejudice against me and an antipathy for my attorneys and a bias in favor of the Office of Special Investigations and the State of Isreal (sic); that his impartial judgment and state of mind in this action has been reasonably and substantially questioned, that he has a bent of mind that will forclose (sic) impartiality, . . . .

In support of these conclusory statements, Respondent offers nothing more than other conclusory remarks.

In paragraph 6 of this affidavit Respondent alludes to "[s]ecret agreements . . . consummated between Judge Battisti, the OSI and a representative of the Soviet Government (sic)" in connection with the Court's handling of a piece of evidence offered by the Government at Respondent's denaturalization hearing as an authentic identification card from a German training camp for concentration camp guards. Respondent offers no specific objective facts that would lend credence to his allegation that such agreements were actually made.

In paragraph 9, Respondent affirms that "during a recent extradition prehearing conference, Judge Battisti went out of his way to express his complete confidence in the credibility of the altered Russian evidence as well as the conduct of Nancy Kramp and the OSI document examiners who had vouched for the KGB documents (sic) regularity." However, Respondent offers no facts on which to base the implied conclusion that the Court's opinion as to evidence submitted in the earlier denaturalization proceeding was grounded in the fact that he favored Government counsel, OSI and the Soviet Union over the Respondent or Respondent's counsel.[11]

In paragraph 12a, Respondent affirms that one of his attorneys was the object of "a strong verbal censure" by the Court when that attorney, in response to the Court's inquiry, indicated that Respondent intended to move the Court to recuse itself. Although Respondent concluded that the Court's language was "prejudicial," and that the Court's actions during the February 9 in-chambers conference "demonstrated personal antipathy toward [Respondent's counsel] and a strong personal bias against [Respondent] and in favor of the OSI and the State of Israel," he offered no objective facts on which to base such conclusions. In the instant case, any objective facts to substantiate Respondent's

---

**11.** In several paragraphs of his affidavit, Respondent makes references to a Department of Justice employee named Nancy Kramp. Ms. Kramp is with the OSI. Any allegations includ-

ed in Respondent's affidavit that are exclusively directed toward employees of the Department of Justice are irrelevant to the instant motion. *See, e.g.,* Respondent's Affidavit, paragraph 8.

allegations regarding the Court's so-called verbal assault on Respondent's counsel would be reflected in the official transcript of the February 9 prehearing conference. The Court is unable to find any such objective facts in the portion of the transcript to which Respondent alludes. The relevant exchange reads as follows:

> THE COURT: Gentlemen, has there been a motion filed for recusal in this case?
>
> MR. O'CONNOR: Not yet. We are just briefing in general terms. There will be.
>
> THE COURT: Do you want to talk about it at this time?
>
> MR. O'CONNOR: It is up to you, Judge, whatever you suggest.
>
> THE COURT: Yes. What do you intend to do?
>
> MR. O'CONNOR: Do you want the substance of our motion at this time?
>
> THE COURT: Yes.

> \* \* \* \* \* \*

> MR. O'CONNOR: .... and we have pending before a Sixth Circuit Judge an appeal from your denial of our motion to vacate and recusal,[12] and I think you are too bound up totally in this case to give an objective ruling, and without going into much detail, to put you in a position where I think should stand down, perhaps even today.
>
> THE COURT: Why don't you tell me what they are is what I am asking you.
>
> MR. O'CONNOR: I have indicated some. The decisions are too closely wound. We are alleging fraud on the Court. We are alleging official misconduct even though you have ruled on that. We are on appeal, and I think, looking at the statute we are in a position where there is some measure of interpretation where there is another case pending with basically the same law

element where this extradition should be suspended.

> \* \* \* \* \* \*

> MR. WOLF: May I ask one question?
>
> THE COURT: State your name when you speak so Mr. Schneebaum can hear you.[13]
>
> MR. WOLF: This is Michael Wolf. In your deportation hearing you indicated at one point, that Judge Battisti conspired with this fraud. Are you arguing here on grounds for recusal? You stated once before, and we would like to know whether that is a part of your argument. You are depending on what? Would you state that one more time for the record? You stated in the deportation hearing that Judge Battisti conspired with OSI.
>
> MR. O'CONNOR: I don't recall making that statement at that deportation hearing. Our motion before Judge Battisti—
>
> MR. WOLF: You are not making that statement now?
>
> MR. O'CONNOR: I don't know where that came from. I never used that word or made that statement. I never used the word "conspiracy."
>
> THE COURT: How about—
>
> MR. O'CONNOR: The only argument cited is that Judge Battisti was involved in the deportation case. He is too close—that wasn't the only argument. When we moved for a new trial—and I think largely because the whole thing was KGB evidence. We wanted to get down to that. We are a little disgusted with KGB evidence. We took a hard look at it, and we found that the blocked-out section which you and Judge Battisti agreed had been blocked out. Everything was blocked out. We got kind of disgusted, and we got a little nervous about it, and I said, "Judge, take a hard look at what they did. Maybe you weren't

---

12. *See* note 7, *infra* at 1323.

13. Mr. Schneebaum has consented to act as *amicus curiae* in the pending extradition matter. He participated in the February 9 conference by way of conference call.

watching when Mr. Epstein got on the stand and said, "That is not a blocked out piece of evidence. This is certified by the Russians," and then he gets back on two weeks later and says, "I made a mistake. It was blocked out, and that's all right because I am going to put a substitute in the record." Judge Battisti makes a final ruling based on 5 and 6, and he goes along with the KGB evidence.

Did I answer your question?

MR. WOLF: My question went to some grounds to clarify—

THE COURT: Just a moment, Mr. O'Connor.

MR. O'CONNOR: I don't know—

THE COURT: Just a moment. You will conduct yourself as a gentleman, and you will be a gentleman and professional with everybody else in the courtroom including me. I will treat you as such, and you will treat them as such. Go ahead.

MR. O'CONNOR: Just a second.

THE COURT: Just a moment.

MR. O'CONNOR: I will not be accused of not being a gentleman by you or anybody else. Are you accusing me of not being a gentleman?

THE COURT: Sir, I am saying to you now, counsel to whom you have been putting your questions will address me, and in his address to me, you will remain quiet until I recognize you—

MR. O'CONNOR: I will follow that ruling, but no one calls me not a gentleman.

THE COURT: Just be quiet. We have other means of dealing with that. Mr. Wolf.

\* \* \* \* \* \*

Conference Transcript, February 9, 1984, pp. 14–21.[14] Not only do relevant portions of the conference transcript fail to lend credence to Respondent's conclusions regarding the import of the Court's words, certain other passages suggest that, in fact, the Court took particular care to maintain a positive rapport with counsel for both parties:

THE COURT: ... All right. Now, I regret the outburst that occurred in the room today. Let's try to avoid that from this point forward and proceed again, as I said, professionally, we have a tough job ahead of us. I expect you to be firm in the arguments, no problem with that, and make your objections when you think they ought to be made, and protect the best interest of your clients. I expect the Government to do the same thing. I will try to the best of my ability to be as courteous with you as I can possibly be and as I think I have always been, as professional men and women in this court.

Conference Transcript, February 9, 1984, p. 55.[15]

---

**14.** Any typographical errors in the excerpts from the February 9 conference transcript reproduced herein were in the original.

**15.** The Court is reminded of at least one case involving a motion for recusal where the reviewing court considered exchanges between the court and counsel that the moving party charged evinced the reviewing court's antipathy for the moving party:

[A]n occasional display of irritation, usually regretted as soon as made, does not suffice to show personal bias or prejudice, whether the irritation was justified or not. *Rosen v. Sugarman,* 357 F.2d at 798.

Although substantial, repeated and unwarranted fits of temper directed by a presiding judge toward the counsel of one of the parties before him could suggest an antipathy between the lawyer and the court that could affect the court's impartiality, Sections 144 and 455 are not to be manipulated by a party seeking recusal to capitalize on an isolated remark made by the court in an effort to maintain order and to protect the record from distortions:

[I]t is not the purpose of Sections 144 or 455 to enable the unscrupulous or reckless lawyer to engage in conduct in the course of litigation that might cause any conscientious judge to express, even in caustic terms, his disapproval of it, and thereby put himself in position thereafter to urge successfully motions to disqualify the judge in his subsequent cases before him. *United States v. Zagari,* 419 F.Supp. at 505.

An affidavit attesting to a particular judge's bias in a given matter over which he presides is strictly construed against the party seeking recusal. *United States v. Zagari*, 419 F.Supp. at 501. Moreover, "in this sensitive area of claimed partiality on the part of a judge, strict construction of the statutory provisions is essential to preventing abuse and to insure the orderly functioning of the judicial system." (Citations omitted.) *Bumpus v. Uniroyal Tire Company*, 385 F.Supp. at 713. Consequently, that the aforementioned paragraphs include conclusory statements regarding judicial bias, rather than objective facts and details, renders Respondent's affidavit legally insufficient under both sections 144 and 455 on at least one ground.

### B.

Not only is it required that legally sufficient affidavit(s) in support of a motion for recusal include objective facts, but sections 144 and 455 also mandate disqualification only where the prejudice or bias alleged is attributable to an extrajudicial source.[16] The court in *Lazofsky v. Sommerset Bus Company*, 389 F.Supp. 1041, 1044 (E.D.N.Y.1975), articulated the rationale behind the extrajudicial source rule:

[I]f the words "impartiality might reasonably be questioned" and "avoid impropriety and the appearance of impartiality" were to be interpreted to encompass judicial rulings in the course of a trial or other proceeding, ... then there would be almost no limit to disqualification motions and the way would be opened to a return to "judge shopping", a practice which has been for the most part universally condemned. Certainly every ruling on an arguable point during a proceeding may give "the appearance of" partiality, in the broadest sense of those terms, to one party or the other.

The court in *United States v. Conforte*, 457 F.Supp. 641, 657 (D.Nev.1978), *vacated*

*in part on other grounds*, 624 F.2d 869 (9th Cir.1980), *cert. denied*, 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980) similarly observed:

The basic rationale of the [extrajudicial source] rule lies in the distinction between the judicial opinions or biases developed by a judge during the course of court proceedings and personal opinions or biases which have their origins in sources outside the courtroom. The former are generally regarded as inevitable and, in fact, as essential to judicial decision-making.

Accordingly, to prevail on a motion for recusal, the moving party must include in his supporting affidavit(s) specific facts that would substantiate allegations of extrajudicial, that is, personal, bias. Personal bias has been defined as:

... an attitude arising from extrajudicial sources that results "in an opinion on the merits on the basis other than what the judge learned from his participation in the case ..., or results in an "attitude toward [the] petitioner that is significantly different from and more particularized than the normal, general feelings of society at large against convicted wrongdoers." (Citations omitted.) *United States v. Sinclair*, 424 F.Supp. at 718.

Courts have consistently affirmed the rule that to demonstrate the kind of personal bias that would render an affidavit in support of a motion for recusal, an affiant must set forth more than the fact that the presiding judge has handed down rulings in earlier cases or the current matter which were unfavorable to the moving party. The court in *United States v. Sinclair*, 424 F.Supp. at 718, put it succinctly when it declared that

[A] claim of bias or prejudice based on judicial knowledge gained from prior hearings or other cases is not sufficient grounds for disqualification of a judge whether it be from prior judicial exposure to the defendant or judicial rulings

---

**16.** Recent case authorities have determined that, under both sections 144 and 455, disqualification must be predicated upon extrajudicial conduct. *See City of Cleveland v. Cleveland Electric Illuminating Company*, 503 F.Supp. at 371–72; *United States v. Zagari*, 419 F.Supp. at 504–5.

adverse to the defendant in the same or different cases.

See also United States v. Grinnell, 384 U.S. 563, 582, 86 S.Ct. 1698, 1709, 16 L.Ed.2d 778 (1966); Berger v. United States, 255 U.S. 22, 34, 41 S.Ct. 230, 233, 65 L.Ed. 481 (1920); Southerland v. Irons, 628 F.2d 978, 980 (6th Cir.1980); Davis v. Board of School Commissioners of Mobile County, 517 F.2d 1044, 1051 (5th Cir.1975), reh. denied, 521 F.2d 814 (5th), cert. denied, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1975); Knapp v. Kinsey, 232 F.2d 458, 465 (6th Cir.1956); Bumpus v. Uniroyal Tire Company, 385 F.Supp. at 714; Martelli v. City of Sonoma, 359 F.Supp. at 399.

It is not surprising that a judge who has some familiarity with the history of a pending matter by virtue of the fact that he presided over an earlier proceeding arising out of the same event(s), or involving some or all of the same parties, would be capable of presiding impartially over the pending matter. To suggest otherwise would raise serious doubts with regard to the practice in federal trial courts of allowing litigants to file such cases as related matters so as to facilitate their administration and resolution. The court in Weber v. Garza, 570 F.2d 511, 512, n. 1 (5th Cir.1978), recognized the speciousness of the charge that a court's prior determinations in earlier matters which bore some relationship to a subsequent matter over which a court is to preside necessarily prejudice that judge with regard to the subsequent matter:

> For purposes of recusal, it is insufficient to allege, without more, that a judge is familiar with the factual and procedural background of a case by reason of having served as a judge in previous related cases.

A judge's actions in earlier related cases are simply not covered by sections 144 and 455. Specifically, "[r]ulings adverse to the litigant are not sufficient" to constitute extrajudicial bias. See Martelli v. City of Sanoma, 359 F.Supp. at 399. In Davis v. Board of School Commissioners of Mobile County, 517 F.2d 1044, the movant based his recusal motion on the trial court's actions with regard to an order that was issued in connection with movant's case and an opinion in an earlier case over which the trial court had presided. On appeal of the trial court's denial of the movant's recusal motion, the Fifth Circuit concluded that the trial court's actions had not been extrajudicial. 517 F.2d at 1051.

■ In the instant case, none of Respondent's allegations in support of his Motion for Recusal focus on extrajudicial conduct on the part of this Court: Paragraph 2 makes reference to an alleged preference this Court has for the OSI and the State of Israel over Respondent. Any relationships the Court has with these two entities are outgrowths of their roles in either the 1981 denaturalization proceeding or the current extradition matter. Paragraph 3 of Respondent's affidavit refers to the use of so-called "foreign evidence" in the 1981 denaturalization proceeding over which this Court presided and to which the Respondent was a party. Paragraphs 5, 6 and 7 all focus on the admissibility of a piece of evidence from the 1981 denaturalization proceeding—the Trawniki Training Camp identification card. Respondent challenges that the card was altered by the Soviets, with the cooperation of the OSI and this Court, in order to implicate Respondent as a former concentration camp guard. Moreover, Respondent charges that the Court erred when it allowed representatives of the Soviet government to return the original card to the Russian Archives after both parties and the Court had examined it at the denaturalization proceeding, and that the copies of the card that were included in the record of the proceeding were carelessly handled by courthouse staff to Respondent's detriment. All of these challenges were raised in his motion to this Court to vacate its order revoking Respondent's citizenship. Paragraph 9 alludes to remarks made by the Court during the February 9, 1984 prehearing conference on the extradition matter currently before the Court with regard to the camp identification card. In paragraph 10, Respondent bases his challenge on the fact that he received an ad-

verse ruling from this Court on his Motion to Vacate Judgment. In paragraph 12a, Respondent indicates that he received a verbal censure from this Court during the February 9 prehearing conference on the extradition matter. In paragraph 12b, Respondent attempts to substantiate his challenge to the Court's impartiality by relying on the Court's findings in the 1981 denaturalization proceeding as they were articulated in the Court's June 23, 1981 memorandum decision. The Court is not clear on what basis Respondent makes his challenge in paragraph 13. Seemingly, Respondent is alleging that the Court will be biased against him because he has appealed the Court's denial of his Motion to Vacate Judgment. In paragraph 14, Respondent refers to three orders issued by this Court with regard to the disposal of some preliminary matters in connection with the extradition request.[17] In paragraph 16, Respondent alleges that certain OSI attorneys attended the February 9 prehearing conference at the Court's behest. Finally, in paragraph 17, Respondent refers to an exchange between the Court, Respondent's counsel and a Government attorney regarding the grounds upon which Respondent intended to base his motion for recusal. That colloquy also took place at the February 9 prehearing conference on the extradition matter before the Court.

 Clearly, with nothing more, this Court's rulings or action in previous related cases will not support a motion for recusal. *See infra* at 15–17. Moreover, interim orders going to the administration of the matter and remarks made by the Court during proceedings to advance the matter ought not suffice. *Cf. United States v. Sinclair*, 424 F.Supp. at 718; *City of Cleveland v. Cleveland Electric Illuminating Company*, 503 F.Supp. 368 (N.D.Ohio 1980). In point of fact, the necessity of allowing trial courts the freedom to administer over their own pretrial procedures lends substantial credence to this Court's

position that such allegations as respondent's regarding the Court's actions in connection with the pending extradition matter, standing alone, are insufficient to support recusal. *Cf. Link v. Wabash R.R.*, 291 F.2d 542, 547 (7th Cir.1961), *aff'd*, 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962). ("The district court must be free to use and control pretrial procedure so to insure the orderly administration of justice.") Commentators have observed that "[o]rdinarily it will not suffice for disqualification that during the course of a case the judge has made remarks critical of a party or his lawyer or that there were other indications of friction." 12 Wright, Miller and Cooper, Federal Practice and Procedure § 3542, p. 352 (1975). Moreover, the court in *United States v. Orbiz*, 366 F.Supp. 628, 630 (D.P.R.1973), noted:

> It is the duty of a judge to arrive at conclusions from manifestations, writings and all other evidence presented in the course of judicial proceedings before him. Critical statements and comments of a judge directed against a moving party, or his counsel or witnesses in the course of his proceedings, have been held insufficient to establish disqualifying personal bias or prejudice on the judge's part, whether discreet or indiscreet.

Applying the aforementioned legal standards of sufficiency to the affidavits submitted in support of the instant Motion, the Court concludes that Respondent fails to present legally sufficient grounds for disqualification. Absent specific factual allegations that any of the Court's conduct in connection with the pending extradition matter has stemmed from extrajudicial sources rather than the Court's established duty to advance the case in an orderly and expedient fashion and to protect the record from obfuscation, Respondent's allegations pertaining to the Court's conduct during a conference on the extradition matter are insufficient to support a claim of bias. Respondent's supporting papers lack specific

---

**17.** Those three unpublished Orders are attached to the instant Memorandum Opinion and Order as Appendix B.

factual allegations that demonstrate that the Court's purported partiality emanates from an extrajudicial source. Rather, the instant Motion is predicated on conduct undertaken in a judicial context.

### III.

The Court has determined that Respondent's Motion and supporting affidavits are insufficient to support recusal on the basis of bias or the appearance of partiality. In light of said determination, the Court has seen fit to examine the question of whether, in spite of the fact that Respondent has failed to meet his burden, the Court may, nonetheless, decline to continue to preside over this extradition matter. In *Roberts v. Ace Hardware, Inc.*, 515 F.Supp. 29 (N.D. Ohio 1981), a trial judge held that although his adverse rulings in prior cases in which the attorney of the plaintiff in the *Roberts* matter in no way indicated personal bias against plaintiff's counsel or plaintiff, he would disqualify himself. That judge reasoned that the justice system would be impaired in its functioning if plaintiff's counsel had to try his case before a judge he believed to be biased against him.

 This Court is sympathetic to the pressure brought to bear on a presiding judge who is faced with a recusal motion of any kind, but declines to follow the example of the *Roberts* court. The majority of courts agree that where there has been no sufficient showing of bias or an appearance of partiality, the judge under scrutiny is not only permitted to continue to preside over the matter, but has an affirmative duty to do so. *United States v. Sinclair*, 424 F.Supp. at 719. According to the court in *City of Cleveland v. Cleveland Electric Illuminating Company*, 503 F.Supp. at 370:

> Underlying this obligation is the recognition that the "granting of a motion to recuse necessarily results in a waste of the judicial resources which have already been invested in the proceeding." . . .

Thus, disqualification is not favored in instances where, as here, a single judge has acquired by experience, familiarity with a protracted involved case which could not easily be passed on to a second judge. (Citations omitted.)

In addition, for this Court to shirk its duty to preside where the moving party has failed to sufficiently assert bias or appearance of bias would encourage others to file legally insufficient recusal motions as a judge-shopping tactic. *United States v. Zagari*, 419 F.Supp. at 501.

The Court had no hand in determining to whom this extradition matter would be initially assigned. The case was assigned as a related matter pursuant to the local rules under which this Court operates. *See infra* at 1324. It is only one of the numerous cases so assigned to this Court every year. As is the case with all matters assigned to this Court, this extradition matter has been impartially and conscientiously presided over to insure its smooth, expeditious and just resolution. Inasmuch as he has failed to successfully allege otherwise, Respondent's Motion for Recusal is hereby denied.

IT IS SO ORDERED.

### APPENDIX A

CASE NUMBER: MISC. 83–349

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

JUDGE FRANK J. BATTISTI

UNITED STATES OF AMERICA,

Plaintiff,

vs.

JOHN DEMJANJUK,

Defendant.

ATTORNEYS AFFIDAVIT AND CERTIFICATION

John J. Gill and Mark J. O'Connor, being duly sworn, say:

1. We submit this affidavit and certification pursuant to 28 U.S.C. § 144 in support of the defendant's motion for recusal of the Honorable Frank J. Battisti.

2. We are the attorneys of record for the defendant in this action.

3. We hereby certify that the motion is made in good faith grounded on the honest

belief that Judge Battisti is biased in favor of the plaintiff, OSI and the State of Isreal.

4. The circumstances which compel this belief are set forth in the accompanying affidavit of John Demjanjuk, the defendant in this action.

5. The information that is recited in our client's affidavit, we furnished to our client, since we are personally familiar with the circumstances and event.

6. We believe that the interests of justice would be served by having this case heard by another Judge.

WHEREFORE, we respectfully request that Judge Battisti proceed no further with this case.

/s/ Mark J. O'Connor
MARK J. O'CONNOR
/s/ John J. Gill
JOHN J. GILL

SWORN TO BEFORE ME and subscribed in my presence, this 23rd day of February, 1984.

/s/ Linda M. Thomas
NOTARY PUBLIC

STATE OF OHIO

COUNTY OF CUYAHOGA

AFFIDAVIT

JOHN DEMJANJUK, being first duly sworn according to law, deposes and says the following:

1. I am the defendant in this action.

2. I submit this affidavit in support of my motion to have the Honorable Frank J. Battisti disqualified from presiding in this case, on the grounds that he has a personal bias and prejudice against me and an antipathy for my attorneys and a bias in favor of the Office of Special Investigations and the State of Isreal; that his impartial judgment and state of mind in this action has been reasonably and substantially questioned, that he has a bent of mind that will foreclose impartiality, and that his bias and prejudice could not have derived from any source other than extrajudicial.

3. I firmly believe that Judge Battisti's personal biased feelings regarding the use of foreign evidence, particularly evidence presented by the Russians and Isrealis, in the "Nazi Cases" sponsored by the Office of Special Investigations in the United States, have contaminated his otherwise balanced judicial thinking, thereby depriving me of that fundamental·impartiality to which I am entitled under the United States Constitution.

4. I am a member of a readily identifiable ethnic group (Ukranian) that Russians, through the good offices of the Office of Special Investigation and now the State of Isreal have determined to target for harassment, persecution and punitive action under the guise of an outwardly laudible legislative goal of bringing true Nazi criminals to "Justice" first civilly in the United States, then criminally in Russia and Isreal.

5. As has been known by Judge Battisti I was made the victim of a carefully orchestrated Russian propaganda and disinformation campaign. The Soviets featured my "case" in one of their leading KGB organs in the United States, the "Soviet Way". The original alleged German I.D. card examined briefly by Judge Battisti during my denaturalization case, was originally displayed, photographically in the "Soviet Way", years before another *blocked out* and *altered* photographic copies of the card (Govt. Exs. 5 & 6) were boldly employed by the Battisti Court to find that I served in a German training camp in Poland, (Trawniki) and as the means of identifying me as a guard at a German death camp (Treblinka). Judge Battisti continued to credit the flawed and corrupt KGB evidence despite the fact that every government produced expert and eyewitness had testified that they had never seen such an ID card as the Russian produced *altered* photographic copy (Govt. Exh. 5). The blocking out on this Russian certified "true copy" was first denied and later *admitted* by the OSI questioned Doc-

uments Examiner, Gideon Epstein, (T. 137–153, 900).

6. Secret agreements were consummated between Judge Battisti, the OSI and a representative of the Soviet Government which allowed the original alleged German ID card to be removed from the denaturalization record the same day that it was admitted by the Court and before it could be forensically examined by my attorney at that time, John Martin, Esq. My attorney now tells me that the record in denaturalization is permeated with instances such as those in which Judge Battisti has shown bias and prejudice toward the OSI and the Russians and scorn toward my attorney.

7. Judge Battisti's decision to allow the Russians to casually remove critical evidence from the District Court record in denaturalization could only have been based upon sources and considerations extraneous to the judicial proceedings, because no explanation of this less than exemplary conduct appears anywhere in the record (T. 915–916).

8. My fears were further aggravated when the KGB blocked out and altered the ID card (Govt. Exh. 5) was strangely missing from the record of my deportation hearing, only to be found in the basement of Judge Battisti's courthouse by my attorney Mark J. O'Connor. Judge Battisti's, clerk George Zeolla, thereafter returned the Russian evidence to Nancy Kramp of the OSI, with apologies on June 14, 1983. This same evidence, was again lost by the OSI later in the deportation case, presently being heard by Judge Adolph Angellili in Cleveland, Ohio. Nancy Kramp's strange role in the handling of the illusive KGB evidence as well as that of Gideon Epstein, is one of the principle substantive areas of concern in defendant's briefs on appeal to the Sixth Circuit.

9. I have been told by my attorney, Mr. O'Connor, that during a recent extradition prehearing conference, Judge Battisti went out of his way to express his complete confidence in the credibility of the altered Russian evidence as well as the conduct of

Nancy Kramp and the OSI document examiners who had vouched for the KGB documents regularty.

10. Strong evidence was presented to Judge Battisti on October 26, 1983 that OSI witnesses had committed perjury during my denaturalization hearing and that other misconduct and fraud on and by the court was evidence at that hearing. Refusing to recuse himself, Judge Battisti cavilierly denied by motion for a new trial. This denial is presently being appealed to the Sixth Circuit Court. The facts in the motion being appealed are identical to the facts being presented by the U.S. Attorney courting for the State of Israel to gain extradition to Israel for a war crimes trial using Judge Battisti's civil findings as the basis for jurisdiction.

11. Nancy Kramp's continuing role in the Extradition case was highlighted by her coordination of exhibits with Gary D. Arbeznik, the Assistant United States Attorney representing the State of Israel in the Extradition Matter. My attorneys inform me that Nancy Kramp's name appears on the civil docket construction sheet as late as December 30, 1983.

12. I became more convinced of Judge Battisti's bias against me when I was told by my attorney, Mr. O'Connor that he had received a strong verbal censure from Judge Battisti for responding frankly to the Judge's request for an explanation of the reasons he should disqualify himself and join in the request for the transfer of this hearing to another judge thoroughly familiar with the proceedings, thereby negating any delay in the administration of justice. Judge Battisti's prejudicial language and actions in chambers after being asked to recuse himself, demonstrated personal antipathy toward Mr. O'Connor and Mr. Gill and a strong personal bias against me and in favor of the OSI and the State of Israel. The source of these predispositions and biases can only be extrajudicial in origin as no provocation occasioned the demeaning verbal censorship of Mr. O'Con-

nor's "professionalism" and his qualities of "gentlemanliness". Nor could Judge Battisti's biased comments about Mr. O'Connor's character in chambers on February 9, 1984 have been derived from any prior judicial proceedings presided over by the Chief Judge.

12. In his memorandum decision of June 23, 1981, Judge Battisti decided many critical issues of fact that are now relied upon exclusively by the State of Israel to request my extradition (under U.S./Isreal Treaty), for a war crimes trial in East Jerusalem. International faith and credit would certainly be given to the disputed, yet twice affirmed, opinion of Judge Battisti in denaturalization. Having overlooked the clear evidence of fraud on the Court found in my motion for a new trial, declaring that a full and fair hearing of all the evidence had already been given by him, how could it reasonably appear that Judge Battisti's actions during the forthcoming Extradition hearing would ever allow for a fair and impartial ruling in a criminal arraignment involving the exact same fact findings he is attempting to defend.

13. I particularly fear Judge Battisti's bent of mind on the issue of my Fifth Amendment rights because I have, herein availed myself of that privilege.

14. I have been told by my attorneys that this Extradition hearing had originally been assigned to Magistrate Perelman who had had prior experience in foreign extradition. Magistrate Perelman in fact presided and issued orders at the time of my arrest for allegedly being a "fugitive from Isreali Justice". Judge Battisti thereafter rested the case from Magistrate Perelman, for reasons known only to him. It can reasonably and substantially be inferred however, that his sudden decision was prejudicially predicated upon the challenge by my attorneys to Judge Battisti's denaturalization fact findings, and to my total lack of effective defense counsel prior to the deportation hearing.

15. Judge Battisti's extrajudicial knowledge concerning the OSI's role in persuading the Isaeli Minister of Justice to saction the application for my extradition more than *seven (7) years after* Isreal became aware of my whereabouts in the United States, puts the lie to any claim by OSI that Judge Battisti has a "duty to sit" in this hearing.

16. My attorneys inform me that OSI representatives, Mike Wolf and Bruce Einhorn, were present, at Judge Battisti's request, at the extradition prehearing conference in chambers. Strangely, Mr. Wolf and Mr. Einhorn are the same OSI lawyers who are demanding that Judge Adolph Angellili to deport me to the Russians for "justice". They are also potentially parties to the missing KGB evidence, found in the U.S. Courthouse basement.

17. My attorneys further inform me that Judge Battisti questioned Mr. O'Connor in chambers about his belief that a Chief Judge of the U.S. District Court would ever collaborate with the OSI regarding the altered KGB evidence or that he could be found guilty of collusion in this regard. Although improperly allowed to be present at this hearing, I am told that Mr. Mike Wolf was allowed to vigorously defend the OSI's and Judge Battisti's role in the use of Russian evidence and other conduct of the parties during denaturalization proceedings and the recent deportation hearings.

18. Based on all of the foregoing, I fear that Judge Battisti's personal bias in favor of the plaintiff, OSI and the State of Isreal and his extrajudicially derived antipathy for my attorneys will deprive me of a hearing, untainted by prejudice and bias.

Affiant further sayeth naught.

/s/ John Demjanjuk
JOHN DEMJANJUK

SWORN TO BEFORE ME and subscribed in my presence, this 23rd day of February, 1984.

/s/ Linda M. Thomas
NOTARY PUBLIC

.. 

APPENDIX B

MISC. NO. 83–349

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

Nov. 18, 1983

IN THE MATTER OF THE
EXTRADITION

OF

JOHN DEMJANJUK, aka JOHN IVAN DEMJANJUK, aka JOHN IVAN DE-MYANYUK A Fugitive from the justice of Israel.

To: United States Marshal

You are hereby commanded to arrest the above-named person and bring that person before Magistrate David Perelman to answer a Complaint requesting extradition to the State of Israel. Immediately upon arrest, the above-named person will appear before Magistrate Perelman for a bail hearing, and all further proceedings will be heard by Magistrate Perelman.

IT IS SO ORDERED.

/s/ Frank J. Battisti
Frank J. Battisti
Chief Judge

MISC. NO. 83–349

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

Nov. 18, 1983

IN THE MATTER OF THE
EXTRADITION

OF

JOHN DEMJANJUK, aka JOHN IVAN DEMJANJUK, aka JOHN IVAN DE-MYANYUK A Fugitive from the justice of Israel.

ORDER

The provision of the Order of November 18, 1983 assigning all further proceedings in this matter to the Magistrate will remain in effect until a succeeding order is issued.

IT IS SO ORDERED.

/s/ Frank J. Battisti
Frank J. Battisti
Chief Judge

Misc. 83–349

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

Nov. 22, 1983

UNITED STATES OF AMERICA,

Plaintiff,

-vs-

JOHN DEMJANJUK,

Defendant.

ORDER

The above-captioned case shall be transferred from Magistrate Perelman to this Court for resolution of the pending extradition petition.

IT IS SO ORDERED.

/s/ Frank J. Battisti
Frank J. Battisti
Chief Judge