In the Matter of the **EXTRADITION OF John DEMJANJUK aka John Ivan Demjanjuk, aka John Ivan Demyanyuk.**

**Misc. No. 83–349.**

United States District Court, N.D. Ohio, E.D.

April 15, 1985.

As Amended April 30, 1985.

Gary D. Arbeznik, Asst. U.S. Atty., Cleveland, Ohio, Murray R. Stein, Alvin D. Lodish, Office of Intern'l Affairs, Michael Wolfe, Bruce Einhorn, Office of Special Investigations, U.S. Dept. of Justice, Washington, D.C., for petitioner.

Mark O'Connor, Buffalo, N.Y., John J. Gill, Cleveland, Ohio, for respondent.

Steven M. Schneebaum, Patton, Boggs & Blow, Washington, D.C., for amicus curiae.

## MEMORANDUM OPINION AND ORDER

BATTISTI, Chief Judge.

On October 31, 1983, the Government of the State of Israel requested the extradition of John Demjanjuk [hereinafter referred to as "respondent" or "the respondent"] from the United States of America pursuant to an Israeli arrest warrant issued on October 18, 1983. The warrant charges Demjanjuk with "the crimes of murdering Jews, [which are] offenses under sections 1 to 4 of the Nazis and Nazi Collaborators (Punishment) Law" of the State of Israel. State of Israel's Request for the Extradition of John Demjanjuk at 11–12.

The Government of the United States pursuant to its obligation under the Convention on Extradition between the Government of the United States of America and the Government of the State of Israel, T.I.A.S. 5476, 14 U.S.T. 1717 (signed December 10, 1962) (entered into force December 5, 1963) [hereinafter "the Treaty"], filed a complaint [hereinafter the "Government's Complaint"] on November 18, 1983, seeking the extradition of the respondent to Israel. In its Complaint, the Government states that respondent is charged with "the crimes of murder and malicious wounding; inflicting grievous bodily harm" which are among the enumerated offenses in Article II of the Treaty, which is still in full force and effect. Government's Complaint at 1–2.

This Court must determine whether respondent can be extradited to the State of Israel pursuant to 18 U.S.C. § 3184.[1]

### I.

### PRIOR HISTORY

The respondent, a native of the Ukraine of the Union of Soviet Socialist Republics [hereinafter referred to as "U.S.S.R."], entered the United States on February 9, 1952; he was granted lawful permanent residence under the Displaced Persons Act of 1948, Pub.L. No. 80–774, ch. 647, 62 Stat. 1009, as amended. On November 14, 1958, he was naturalized as a United States citizen by the United States District Court in Cleveland, Ohio. At his naturalization, he changed his first name from Ivan to John. He subsequently took up residence in Seven Hills, Ohio.

On June 23, 1981, this Court found that respondent had made material misrepresentations in his visa application by failing to disclose his service to the German SS at the Trawniki and Treblinka prison camps in 1942–43. It was ordered that respondent's United States citizenship be revoked and his certificate of naturalization cancelled. *United States v. Demjanjuk*, 518 F.Supp. 1362 (N.D.Ohio, 1981), *aff'd*, 680 F.2d 32 (6th Cir.), *cert. denied*, 459 U.S. 1036, 103 S.Ct. 447, 47 L.Ed.2d 602 (1982).

On December 6, 1982, the Immigration and Naturalization Service began deportation proceedings against respondent. On May 23, 1984, Immigration Judge Adolph F. Angellili found respondent deportable and designated the U.S.S.R. as the country of deportation. However, the immigration judge also granted the respondent the option of voluntary departure from the United States. On February 14, 1985, the Board of Immigration Appeals dismissed respondent's appeal of the deportation or-

---

**1.** Throughout this opinion, the Court will use the words "extraditability" and "extradition." It will be clear from the context of the passage whether the reference is to the Court's legal determination under Treaty and statute (extraditability) or the Executive's discretionary decision (the actual extradition).

der; the Board affirmed the finding of respondent's deportability and reversed the grant of voluntary departure. *In re John Demjanjuk,* —— I & N Dec. ——, File A8–237–417 (Cleveland) (B.I.A. February 14, 1985) [hereinafter "B.I.A. Decision"].

On July 17, 1984, this Court ruled that, despite respondent's appeal of his deportation, the extradition and deportation proceedings are independent and, as a result, respondent's extradition hearing could proceed. The Court also stated that the United States Government was under no obligation to elect deportation or extradition as the exclusive means of proceeding against respondent.

## II.

On March 12, 1985, an extradition hearing for respondent was held. Oral argument was heard and documentary evidence including photographs, affidavits, and prior recorded testimony was presented. No witnesses were called to testify that day in open court.

The issues or conditions necessary for a finding of extraditability have been previously identified. *See* Order of March 5, 1985 at 2. The Court has already determined that jurisdiction is present and that the United States-Israel extradition treaty remains in full force and effect. Order of December 6, 1984, 603 F.Supp. 1463; Order of March 8, 1985. 603 F.Supp. 1468. Three issues were considered at the March 12, 1985 extradition hearing. They are:

1. Whether the respondent is the party named in the complaint [issue of identification];

2. Whether the crimes for which respondent's extradition is sought are offenses "within the treaty" [issues of treaty interpretation]; and

3. Whether there is "competent and adequate evidence" or "probable cause" to believe respondent committed the acts with which he is charged [issue of probable cause].

Each of these issues will be examined and resolved below.

## III.

## IDENTIFICATION

The Court must determine whether respondent John Demjanjuk is the individual named in the complaint. Normally, this inquiry would be simplified by a facial comparison of the respondent's name and that appearing in the complaint. However, in the instant case, respondent alleges that he is not the man whom Israel seeks; in other words, he claims that the person sought and the respondent are *two different* people.

For the following reasons, the Court finds that there is probable cause to believe respondent is the individual who is charged with the crimes alleged by the State of Israel.

The Government submitted four exhibits. They are:

a set of documents, filed November 18, 1983, entitled "State of Israel/Ministry of Justice/Request for the Extradition of John Demjanjuk" [previously cited as "Israeli Extradition Request"] [Government Exhibit 1];

a set of documents, filed January 30, 1984, entitled "State of Israel/Supplement to the Request for the Extradition of John Demjanjuk" [Government Exhibit 2];

a set of documents, filed March 2, 1984, entitled "State of Israel/Additional Supplement to the Request for the Extradition of John Demjanjuk" [Government Exhibit 3];

a document filed November 18, 1983, entitled "Declaration of Jeffrey H. Smith [Assistant Legal Adviser, United States Department of State]" [Government Exhibit 4].

Government Exhibits 1–3 are all certified as "authenticated documentary evidence" by James F. Hughes III, Consul General of the United States of America at Tel Aviv, Israel. Consul General Hughes certified and placed the seal of his office on Government Exhibit 1 on November 3, 1983.

Government Exhibits 2 and 3 were similarly certified by Hughes on January 12, 1984 and February 9, 1984 respectively. Government Exhibit 4 is certified with the seal of United States Department of State by Secretary of State George Schultz through Acting Authentication Officer Joan C. Hampton; it was sealed November 17, 1983.

Respondent has not questioned the certification and authenticity of the evidence against him submitted by the Government in this extradition matter. At the March 12, 1985 extradition hearing, the Court identified the proper standard for the admission of evidence in an extradition proceeding. Transcript of March 12, 1985 Hearing, at 111–112. [hereinafter "March Tr."] Documentary evidence which has been authenticated in the statutory manner and then certified by an appropriate United States diplomatic or consular official must be admitted in an extradition proceeding. 18 U.S.C. § 3190. Since the admission of properly certified evidence is obligatory on the extradition court under 18 U.S.C. § 3190, the Court instructed the respondent that evidentiary challenges "may only question whether the certification or authentication complies with the statute." March Tr. at 112. The Court repeatedly asked counsel for respondent to state for the record his specific objections to the evidence. March Tr. at 113, 118, 120, 121, 123, 124, 125, 127, 129, 134–35, 164. Counsel for respondent repeatedly "reserved his objections," see March Tr. at 114, 120, 134–35. However, when the Court specifically asked counsel to put on the record any remaining objections he had to the evidence, respondent's counsel stated he "ha[d] nothing more." March Tr. at 165.

The Court viewed the documents and respondent's "objections," none of which directly contested the certification or authentication of the evidence submitted. Citing both 18 U.S.C. § 3190 and Article X of the U.S.-Israel extradition treaty, the Court found the documents properly certified and authenticated and admitted the four exhibits into evidence. March Tr. at 165–66.

■ The Government need only make out a prima facie case to establish identification. *Argento v. Jacobs*, 176 F.Supp. 877, 879 (N.D.Ohio, 1959) (Weick, J.). Numerous cases establish that identification in an extradition proceeding requires only a threshhold showing of probable cause. In *Raftery ex rel. Fong v. Bligh*, 55 F.2d 189 (1st Cir.1932), the First Circuit reviewed a habeas corpus decision to determine whether the district court had correctly identified the individual who was to be extradited for murder. The court found that there was competent evidence on the record, *id.* at 195, and that the affidavits identifying the requested individual were properly certified and authenticated. *Id.* at 193.[2]

In *Hooker v. Klein*, 573 F.2d 1360, 1367 (9th Cir.1978), the Court stated that "[t]he extraditing court also has the duty to determine whether the party brought before it is the one named in the *complaint.*" (emphasis added) However, rather than merely examining the complaint, that is, the document filed by the United States Government, the Court must review the arrest warrant or charging document filed by the requesting government. Indeed, the *Hooker* opinion does make such a review: "The

---

**2.** In *Raftery*, an interstate extradition case, the Court stated that the extraditing official, in that case the Governor of Massachusetts, did not need to consider whether the person arrested (i.e. the person responding to the extradition) is identical to the person demanded. *Id.* at 193. The Court stated that the burden of proving that the person arrested is a fugitive from justice is upon the state, "there being no presumption that the person arrested is the person demanded." Although *Raftery* was a habeas corpus proceeding, the inference for the instant case is that the

extraditing magistrate in the first instance need not determine absolutely that the person demanded and the one arrested are the same. The Government, however, still has the burden of proving some nexus between the two, namely probable cause to believe the two are the same. However, once the extradition warrant is issued, the *Raftery* court noted it must be regarded as "presumptively right," the burden of overcoming the presumption being on petitioner (relator). *Id.* at 193.

record of the extradition proceeding also reveals that there was competent legal evidence before the extradition judge upon which he could find that the person before him was the one named in the *extradition warrant* ..." (emphasis added). *Id.* at 1369. The proposition that the extradition warrant is the document to focus upon finds further support in *Fernandez v. Phillips*, 268 U.S. 311, 313, 45 S.Ct. 541, 543, 69 L.Ed. 970 (1925): "The *warrant* is said to be bad because it names Mariano Viamonte, and not Mariano Viamonte Fernandez, the appellant. He is named both ways in the proceedings and is identified by testimony. There is nothing in this objection...." (emphasis added). A similar passage appears in *Charlton v. Kelly*, 229 U.S. 447, 448–49, 33 S.Ct. 945, 946, 57 L.Ed. 1274 (1912): "The proceedings for the extradition of the appellant were begun upon a *complaint* duly made by the Italian Vice-Consul, [the submission from the requesting government] charging him with the commission of a murder in Italy.... At the hearing, evidence was produced which satisfied Judge Blair that the appellant was a fugitive from justice and that he was the person whose return to Italy was desired...."

Examining the Government's Complaint in the instant case proves nothing. The United States seeks "one John Demjanjuk, who currently resides at 847 Meadow Lane, Seven Hills, Ohio." There is no question that respondent lives at this address in Seven Hills. However, the Israeli Extradition Request states the following:

### A—Description of Person Whose Extradition is Requested

2. Demjanjuk's personal particulars and description are as follows:

| | |
|---|---|
| Family Name: | Demjanjuk |
| First Name: | John |
| Also known as: | Iwan Demjanjuk |
| | Ivan Demjanjuk |
| | "Ivan Grozny" ("Ivan the Terrible") |
| Father's Name: | Mikola *or* Nikola |
| Date of Birth: | April 3, 1920 |
| Place of Birth: | Dub Nacharenzi, Ukraine, a republic of the U.S.S.R. |
| Last known residence: | 847 Meadow Lane, Seven Hills, Ohio |

**Israeli Extradition Request** at 1.

Respondent contends that he is not the Ivan Grozny sought by Israel. Transcript, Hearing of Dec. 17, 1984, at 55 [hereinafter "December Tr."].[3]

In the hearing on this matter held December 17, 1984, the United States Government was asked "What evidence is relied upon by the State of Israel to establish that the requested individual is indeed, the respondent?" December Tr. at 50. Counsel for the Government responded:

"[T]here is no question in the Government's mind that the identification infor-

---

**3.** The Government of Israel states the following in its request under "Identification of Demjanjuk":

A. A Photograph of Demjanjuk is attached hereto and marked Exhibit "A". This photograph has been identified by witnesses, whose statements are included in this Request for Extradition, as a picture of the person known to them as "Ivan" or "Iwan" or "Ivan the Terrible" from the Treblinka death camp (See Exhibits C, D, E, and F).

B. For further identification of Demjanjuk as the person requested by this Request for Extradition, reference is hereby made:

1. To his identification from pictures by witnesses who testified at the trial of the case of *United States of America v. John Demjanjuk*, 518 F.Supp. 1362 (N.D.Ohio 1981) (an action to cancel Demjanjuk's U.S. citizenship);

2. To the findings by the Court in that case concerning the eyewitness identification of Demjanjuk as the 'Ivan' from Treblinka.

See Memorandum of Decision and Order of the Court which is attached hereto and marked Exhibit B.

Israeli Extradition Request at 1–2.

mation that is separate and apart from the denaturalization findings of fact which are incorporated are abundantly clear and meet the standards [of identification] in and of themselves....

The Government submits that the witness affidavits over and apart from those that are incorporated via the denaturalization case are sufficient."

December Tr. at 54–55.

Although the Government did not directly state on what evidence it was relying, *see* December Tr. at 54, and did state that Israel had incorporated the denaturalization findings as part of its Extradition Request, *id.*, the thrust of its statement is that the eyewitness identifications are independent from the denaturalization identification and sufficient in themselves to establish that respondent is the individual sought in this extradition request.

■ It is well-established that sworn statements of witnesses and photographs may be used to identify individuals sought for extradition. *Argento v. Horn*, 241 F.2d 258, 263 (6th Cir.1957) (Stewart, J.); *In re Edmondson*, 352 F.Supp. 22 (D.Minn.1972) (Counsel General of U.S. in Ottawa submits certified affidavit and "certified photographs of the two respondents which this court personally compared with the individuals as they appeared in court at the extradition hearing"); *Ex part Romano*, 40 F.2d 750 (S.D.Calif.1930) (a photograph identified as that of the murderer by two witnesses residing at Bivona, where the crime was committed, was attached to the depositions and introduced in evidence at the hearing: evidence was sufficient to establish identity); *Bagley v. Starwich*, 8 F.2d 42, 42 (9th Cir.1925) ("a photograph of one of the robbers, authenticated by two witnesses, is attached as an exhibit to these depositions, and it appears that this is a photograph of appellant. This was a proper method in which to prove the identity of appellant with the robber.").

Having determined that the Government need only make out a prima facie case and that affidavits may be used to identify an individual sought for extradition, the Court will consider the affidavits submitted by the Government to determine if they meet the probable cause standard for identification.

The first eyewitness affidavit, marked as "Exhibit C" in the Israeli Extradition Request (Government Exhibit 1), is a "Statement under Oath" made by Elijahu Rosenberg, delivered before the Magistrate Court of Tel Aviv. The statement, which is translated from the Hebrew, is certified by Judge David Steinmetz of the Magistrate Court of Tel Aviv as having been made by Rosenberg on October 24, 1983. In the statement, Rosenberg confirms that he testified on February 18 and 19, 1981 in respondent's denaturalization trial and that the documents attached to the Israel extradition request are all accurate transcriptions of his testimony. In item # 5 of the statement, Rosenberg states: "There has been shown to me a photograph marked with the letter 'A.'. This is a picture of the man known to me as Iwan from Treblinka. I identified this photograph at the above trial as set out on page 520 of the attached transcript."

The second affidavit, identified as "Exhibit D" in Government Exhibit 1, is a similar statement made by Pinhas Epstein, who testified in the denaturalization trial on February 20, 1981. On October 24, 1983, he stated under oath before Judge Steinmetz that the photograph marked with the letter 'A' was "the man known to me as Iwan from Treblinka." Sonia Lewkowicz in the third affidavit, which is identified as "Exhibit E" in Government Exhibit 1, also identified the photograph with the letter 'A' as a photograph of the "man known to me as Iwan from Treblinka." Her statement was made before Judge Steinmetz on October 24, 1983. Lewkowicz testified at the denaturalization trial on February 19, 1981.

Government Exhibit 1 also contains, as "Exhibit F", the "Statement under Oath" of Joseph Czarny, made before Judge Steinmetz on October 24, 1983. Czarny states that on September 21, 1976, he "made a statement in German to a police officer at

the National Police Headquarters in Tel Aviv concerning Ivan Demjanjuk, known to me by the nickname "Ivan the Terrible" from the Treblinka camp during the years 1942–43." He states in item 3 that "There has been shown to me a photograph marked with the letter 'A' and I identify that as a picture of the man known to me as 'Ivan' from Treblinka."

In his statement to the police on September 21, 1976, Czarny states that upon seeing three brown cardboard sheets with seventeen photos on them, he pointed to photo No. 16 "at first sight", saying:

"Why, this is Ivan Grozny, it is Ivan, the notorious Ivan. It is thirty-three years since then, but I recognise him at first sight with complete certainty. I believe I would recognize him even by night. He was very tall, of sturdy build, his face was not so full and bloated then as it is in this picture. But it is the same facial structure, the same nose, the same eyes and forehead as he had. A mistake is out of the question."

Government Exhibit 1, "Exhibit F", statement at 1–2 (p. 2 of the German original).

The photograph marked letter 'A' which witnesses Rosenberg, Epstein, Lewkowicz, and Czarny all identified as the respondent is the photograph which appeared on John Demjanjuk's 1952 visa application to the United States. There is no question that this is indeed a picture of respondent or that it is authentic.

Government Exhibit 1 also includes as Exhibits "G" and "H" transcripts of the testimony of witnesses Chiel Rajchman and Georg Rajgrodzki in respondent's denaturalization trial. The Court notes that the witnesses did identify respondent as Ivan from Treblinka during the denaturalization trial.

Government Exhibit 2 consists of three affidavits. The first affidavit is that of Dr. Yitzhak Arad.[4] Based on his research, including the books and articles he has authored, Dr. Arad states "My research on the subject of the Treblinka death camp has also shown that during the period 1942–43, the gas chambers at Treblinka were operated by two Ukranians known to the prisoners and inmates of the camp as 'Ivan the Terrible' and his assistant, Nikolai." Dr. Arad's statement is certified as being made on December 22, 1983.

The second affidavit in Government Exhibit 2 is an affidavit by Elijahu Rosenberg. It is certified as being made on January 5, 1984. In the affidavit, Rosenberg states that at the denaturalization trial, he testified that he:

had the opportunity to observe the persons who operated the motors which sent the poisonous gas fumes into the gas chambers, and that I saw that the persons who operated these motors were two Ukranians by the names of Iwan and Nikolai.

I hereby confirm that at the said trial, I identified two photographs as being pictures of the man known to me as "Ivan" or "Ivan the Terrible" from the Treblinka death camp.

The third affidavit is that of Marvin E. Hankin, who is Senior Assistant to the Staff Attorney for the Israel Ministry of Justice. The affidavit is certified as being made on January 6, 1984. On page 3 of that affidavit, Hankin states:

I hereby certify that the photograph attached hereto and marked 'A' is the identical photograph which was previously identified by the witnesses Elijahu Rosenberg, Pinhas Epstein, Sonia Lewkowicz and Joseph Czarny and which was attached as Exhibit A to Israel's Request of October 31, 1983 for the Extradition of John Demjanjuk.

Government Exhibit 3 contains two statements made under oath. Exhibit "ER" is a "Statement [made] under Oath" by Elijahu

---

**4.** Dr. Arad is a historian who received a doctorate in the History of the Holocaust from the University of Tel Aviv. Dr. Arad, at the time he gave his statement, was Chairman of the Directorate of the Yad Vashem Martyrs and Heroes Remembrance Authority in Jerusalem, which is a museum and archives covering the holocaust period from 1933 to 1945. By 1984, Dr. Arad had been Chairman of the Directorate for 12 years.

Rosenberg on February 5, 1984. In it Rosenberg states that:

> Today, the 5th of February 1984, Mr. Martin Kolar, of the Israel Police Unit for the Investigation of Nazi Crimes, produced to me the picture attached hereto and marked 'ER/1'. I hereby confirm that this is a picture of John (Ivan) Demjanjuk whom the State of Israel wishes to extradite and bring to trial for the deeds he committed in the years 1942 and 1943 at the Treblinka death camp ... In my evidence [testimony] in the [denaturalization] case, I referred to Demjanjuk by the name 'Iwan' because this is how he was known to me when I was imprisoned in the Treblinka camp.

Exhibit PE is a "Statement [made] under Oath" by Pinhas Epstein on February 5, 1984. Epstein states:

> On the 5th of February 1984 Mr. Martin Kolar, of the Israel Police Unit for the Investigation of Nazi Crimes, produced to me the picture attached hereto and marked "PE/1". I hereby confirm that this is a picture of John (Ivan) Demjanjuk whom the State of Israel wishes to extradite and bring to trial for the deeds he committed in the years 1942 and 1943 at the Treblinka death camp.... In my evidence [testimony] in the said case, I referred to Demjanjuk by the name "Iwan" because this is how he was known to me when I was imprisoned in the Treblinka camp.

The photographs marked 'ER/1' and 'PE/1' are identical to one another. They are circa. 1982 photographs of John Demjanjuk.

The Court finds that there is sufficient evidence based on the eyewitness affidavits submitted by the Government to conclude that there is probable cause to believe respondent is the individual known as Ivan Demjanjuk sought by Israel and named in the arrest warrant. This Court need not identify a particular number or quantity of evidence to reach its determination. It is enough to say that there is sufficient evidence on the record, based on the Rosenberg, Epstein, Lewkowicz, and Czarny affidavits, which is both authentic and relevant, to find that the Government has made a *prima facie* case that respondent John Demjanjuk is the man whose extradition is sought. As previously stated, it is not an extradition court's function to determine with absolute certainty whether the individual sought actually committed the offenses.

The case of *In re Assarsson*, 635 F.2d 1237 (7th Cir.1980), is instructive regarding identification. In that case, a Swedish citizen brought a habeas corpus action challenging his extradition to Sweden on charges of arson, fraud and attempted fraud. Assarsson did not contest that he was the person whose arrest was sought. *Id.* at 1246. The court specifically distinguished his case from those cases "where the identity of the person seized in the requested state was at issue." *See, e.g., Raftery ex. rel. Fong v. Bligh*, 55 F.2d 189 (1st Cir.1932), *supra*, at 548. However, in *Assarsson*, as in the instant case, the authentication of the documents was not an issue. *See supra* at 547–548. Assarsson's objection was to whether the evidence (since it lacked a photograph) was sufficient to identify him. The court stated:

> [i]t may be that on the full trial [the requested individual] may be able to submit substantial proof that another rather than he was the perpetrator of the fraud, but that is a matter for exploration during the trial in [the requesting country] and not for extensive evidentiary inquiry during the extradition hearing.

*Assarsson*, at 1245 (quoting from *Peroff v. Hylton*, 542 F.2d 1247, 1249 (4th Cir.1976), *cert. denied*, 429 U.S. 1062, 97 S.Ct. 787, 50 L.Ed.2d 778 (1977) (extradition request from Sweden) ). Hence, as *Assarsson* indicates, should respondent be tried in Israel, he can present exculpatory evidence that he was not the person who committed the crimes with which he is charged.

Respondent has attempted to call into question this identification by questioning the integrity of the earlier denaturalization proceeding against him. He specifically alleges fraud and misconduct on the part of

the Government and this Court, claiming that the Trawniki I.D. bearing respondent's picture was "intentionally altered" by the Soviet Union and is "fraudulent." Respondent's Reply to Government's Pre-Hearing Memorandum (May 24, 1984) at 27–29. The Court will not, once again, reconsider these charges here, having done so numerous times before. *See* Order of February 12, 1985, *United States v. Demjanjuk*, Case No. 77–923 (second motion to vacate); *Matter of Demjanjuk*, 584 F.Supp. 1321 (N.D.Ohio 1984) (recusal motion); *United States v. Demjanjuk*, 103 F.R.D. 1 (N.D. Ohio 1983) (first motion to vacate). Respondent's charges have been found to be baseless. The denaturalization proceeding has been reviewed and affirmed on appeal. *See United States v. Demjanjuk*, 680 F.2d 32 (6th Cir.), *cert. denied*, 459 U.S. 1036, 103 S.Ct. 447, 74 L.Ed.2d 602 (1982); *see also* B.I.A. Decision, at 7–10.

Although respondent has continued to dispute the use of the Trawniki card despite numerous decisions refuting his position, there is sufficient evidence to identify respondent for extradition purposes without reference to the Trawniki card at all. The independence of the evidence was noted by the Board of Immigration Appeals.

> Moreover, contrary to respondent's allegations, the Trawniki card was not the sole evidence of the respondent's activities at Trawniki and Treblinka. The respondent's arguments conveniently ignore the fact that five surviving prisoners and a German guard identified the respondent's photograph as that of the Ivan who operated the gas chambers at Treblinka.

B.I.A. Decision, at 9–10.

Those eyewitness identifications remain sufficient to establish respondent's identity. The identifications were based on viewing a photograph marked "A". This photograph is the 1952 visa application photograph of John Demjanjuk. It is not the picture which appears on the Trawniki I.D. card. The subsequent identifications made by witnesses Rosenberg and Epstein in the supplementary motions were based on photographs marked "ER/1" and "PE/1." These are identical photographs. The photograph is a picture, circa 1982, of John Demjanjuk, standing in front of a height chart. Hence, the eyewitness identifications were based on photographs, the authenticity of which is not questioned. Respondent's efforts to call into question these identifications made on the basis of authenticated photographs simply because the identifications were made in the denaturalization proceedings can not be countenanced. Not only have these denaturalization findings and proceedings been found to be proper but the fact that the identifications were made in open court and under oath serves to insure that the identifications were conducted properly.

Respondent's counsel argues that there is "absolutely no connection" between John Demjanjuk and Ivan Grozny, the guard at the Trawniki and Treblinka camps. Transcript of March 12, 1985 Hearing [hereinafter referred to as "March Tr."]. Respondent's counsel stated at the March 12th extradition hearing that the Government should proceed "on the basis of *some identification* that shows this is the individual, and if it is, in fact, linked with 1942 and 1943, then there ought to be *some evidence* of probable cause as opposed to a mere allegation that he has been the man on trial for the last seven years or so." (emphasis added). March Tr. at 157, 158. The Court does not know what type of evidence respondent means when he says "some evidence."[5] Absolute certainty is not required

---

**5.** The Court is unaware of any evidence other than eyewitness affidavits and photographs which are available in the instant case. Surely, fingerprints, blood samples, dental records, voice recordings, etc. and other types of physical or scientific evidence are unlikely here, given the destruction of the camps and the passage of time. It is therefore noteworthy that respondent admits that he had a blood group tatoo inside his left arm which was later removed. An expert witness testified that only members of the German SS would be so marked. *Demjanjuk*, 518 F.Supp. at 1377–78; BIA Decision, at 10. However, this evidence was adduced at the denaturalization hearing and has not been submitted as part of the Government's evidence in

in the law, whether it be for identification purposes or in meeting burdens of proof.

■ This Court finds that not only are the eyewitness identifications sufficient but there is an obvious and striking resemblance between the man depicted in the submitted photographs and the respondent, which when taken together clearly rise to the level of probable cause.

## IV.

### TREATY INTERPRETATION

Turning to the second element an extradition court must consider, this Court will decide whether respondent has been charged with having committed, within the jurisdiction of the State of Israel, any of the crimes provided for in the Treaty. 18 U.S.C. § 3184.

### A. Israeli Jurisdiction

■ Respondent asserts that Israel lacks jurisdiction under "recognized principles of International Law" to bring him to trial. Respondent's Motion to Terminate at 11 (filed April 2, 1984). If Israel lacks jurisdiction,[6] the United States can not extradite respondent to Israel. Israel's assertion of jurisdiction over respondent, however, is proper under both Israeli municipal law and international law. Furthermore, Israeli jurisdiction does not violate United States jurisdictional principles or practices in any way.

In 1950, Israel enacted the Nazis and Nazi Collaborators (Punishment) Law, 5710-1950. [hereinafter "Nazi Statute"][7] This statute makes crimes against the Jewish people, crimes against humanity and acts constituting war crimes which occurred during the Nazi period, *inter alia*, punishable under Israeli law.[8] The statute

this extradition proceeding. The Court is therefore not relying on the tatoo in making its identification determination.

6. Absent contrary Congressional intent, international law is part of the law of United States. *Accord The Paquete Habana,* 175 U.S. 677, 712, 20 S.Ct. 290, 304, 44 L.Ed. 320 (1900); *Tag v. Rogers,* 267 F.2d 664 (D.C.Cir.1959), *cert. denied,* 362 U.S. 904, 80 S.Ct. 615, 4 L.Ed.2d 555 (1959).

7. This statute was passed by the Israeli Knesset on the 18th Av, 5710 (1st August, 1950), and published in *Sefer Ha-Chukkim* No. 57 of the 26th Av, 5710 (9th August, 1950). p. 281. The Bill and an Explanatory Note were published in *Hatza'ot Chok* No. 36 of the 11th Adar, 5710 (28th February, 1950). p. 119.

8. Section 1(a) of the statute provides:
A person who has committed one of the following offences—
(1) done, during the period of the Nazi regime, in an enemy country an act constituting a crime against the Jewish people;
(2) done, during the period of the Nazi regime, in an enemy country, an act constituting a crime against humanity;
(3) done, during the period of the Second World War, in an enemy country, an act constituting a war crime, is liable to the death penalty.
Sections 2, 3 and 4 provide, in relevant part:
2. If a person, during the period of the Nazi regime, committed in an enemy country an act by which, had he committed it in Israel territory, he would have become guilty of an

offence under one of the following sections of the Criminal Code, and he committed the act against a persecuted person as a persecuted person he shall be guilty of an offence under this Law and be liable to the same punishment to which he would have been liable had he committed the act in Israel territory: ...
(e) section 312 (manslaughter);
(f) section 214 (murder); ...
(j) section 238 (grievous harm); ...
3. (a) A person who, during the period of the Nazi regime, in an enemy country, was a member of, or held any post or exercised any function in, an enemy organisation is liable to imprisonment for a term not exceeding seven years....
4. (a) A person who, during the period of the Nazi regime, in an enemy country and while exercising some function in a place of confinement on behalf of an enemy administration or of the person in charge of that place of confinement, committed in that place of confinement an act against a persecuted person by which, had he committed it in Israel territory, he would have become guilty of an offence under one of the following sections of the Criminal Code, shall be guilty of an offence under this Law and be liable to the same punishment to which he would have been liable had he committed the act in Israel territory: ...
(3) section 241 (wounding and similar acts);
(4) section 242 (failure to supply necessaries);
(5) section 249 (common assault);

defines these crimes as follows:

1.(b) In this section—

"crime against the Jewish people" means any of the following acts, committed with intent to destroy the Jewish people in whole or in part:

1. killing Jews;
2. causing serious bodily or mental harm to Jews;
3. placing Jews in living conditions calculated to bring about their physical destruction;
4. imposing measures intended to prevent births among Jews;
5. forcibly transferring Jewish children to another national or religious group;
6. destroying or desecrating Jewish religious or cultural assets or values;
7. inciting to hatred of Jews;

"crime against humanity" means any of the following acts:

murder, extermination, enslavement, starvation or deportation and other inhumane acts committed against any civilian population, and persecution on national, racial, religious or political grounds;

"war crime" means any of the following acts;

murder, ill-treatment or deportation to forced labour or for any other purpose, of civilian population of or in occupied territory; murder or ill-treatment of prisoners of war or persons on the seas; killing of hostages; plunder of public or private property; wanton destruction of cities, towns or villages; and devastation not justified by military necessity.

No argument has been advanced that the Israeli statute was not validly enacted under Israeli law. The Request to Issue Warrant of Arrest, presented to the Magistrate Court in Jerusalem (October 18, 1983)

[hereinafter "Warrant Request-Exhibit J"] and the Warrant of Arrest, issued by Judge A.M. Simcha of the Magistrate Court (October 18, 1983) [hereinafter "Arrest Warrant-Exhibit J"], both included in the Israeli Extradition Request,[9] show that respondent is charged with offenses within the statute.[9a] Israeli courts have recognized their jurisdiction to bring to trial war criminals for extraterritorial crimes, pursuant to the Nazi statute. *Accord Attorney General of the Government of Israel v. Adolf Eichmann,* 36 I.L.R. 5 (Dist.Ct. Jerusalem, 1961) *(reprinted,* in relevant part, 56 *Am.J. Int'l L.* 805 (1962); *aff'd,* 36 I.L.R. 277 (1962). Thus, the assertion of jurisdiction over respondent is certainly proper under Israeli law.

■ International law does not generally prohibit the application of a state's laws (so-called "jurisdiction to prescribe") or the jurisdiction of its courts ("jurisdiction to enforce") over non-citizens or acts committed outside of its territory. *The Case of S.S. Lotus (France v. Turkey),* [1927] P.C. I.J. Ser. A, No. 10 at 19. Rather, states have a "wide measure of discretion which is only limited in certain cases by prohibitive rules." *Id.* In other cases, every state remains "free to adopt the jurisdictional principles which it regards as best and most suitable". *Id.* The exercise of extraterritorial criminal jurisdiction over non-citizens in certain circumstances does not violate a state's international obligations, such as the duty to respect the sovereignty of other states. *See id.* at 20. It need not be decided here whether international law permits all that it does not forbid. Israel's assertion of jurisdiction over respondent based on the Nazi statute conforms with the international law principles of "universal jurisdiction".

---

(6) section 250 (assault causing actual bodily harm);

(7) section 261 (unlawful compulsory labour); . . .

**9.** The "Warrant Request-Exhibit J" and the "Arrest Warrant-Exhibit J" are two separate documents which are included in Government Exhibit 1, the Israeli Extradition Request. They are identified therein as Exhibit J.

**9a.** See discussion *infra* at 560.

**556**

■ International law provides that certain offenses may be punished by any state because the offenders are "common enemies of all mankind and all nations have an equal interest in their apprehension and punishment." *United States v. Otto*, Case No. 000–Mauthausen–5 (DJAWC, July 10, 1947) (citing *Wheaton's International Law* (6th Ed.), Vol. 1 at 269); *see also* Restatement of the Foreign Relations Law of the United States, Tentative Draft No. 2 (1981) § 404 [hereinafter "Restatement"]. Universal jurisdiction over certain offenses is established in international law through universal condemnation of the acts involved and general interest in cooperating to suppress them, as reflected in widely-accepted international agreements and resolutions of international organizations. Restatement § 404, Comment (a). Piracy is the paradigm of an offense "against the common law of nations". *See United States v. Otto.* Other crimes which are universally condemned include participation in the slave trade and attacks on or hijacking of aircraft. Restatement § 404. *Accord* Hague Convention for the Suppression of Unlawful Seizure of Aircraft, 22 U.S.T. 1641, T.I.A.S. 7192 (1971); Montreal Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation, 24 U.S.T. 564, T.I.A.S. 7570 (1973). The power to try and punish an offense against the common law of nations, such as the law and customs of war, stems from the sovereign character of each independent state, not from the state's relationship to the perpetrator, victim or act. *United States v. Brust* at 6, Case No. 000–Mauthausen–7 (DJAWC, Sept. 19, 1947), *aff'd*, War Crimes Board of Review, Office of the Judge Advocate (Nov. 6, 1947).

The principle that the perpetrators of crimes against humanity and war crimes are subject to universal jurisdiction found acceptance in the aftermath of World War II. The wartime Allies prosecuted persons accused of war crimes and crimes against humanity in several forums.[10] In a number of instances, they exercised extraterritorial jurisdiction over the accused. The International Military Tribunal at Nuremberg tried major war criminals "whose offences ha[d] no particular geographical location". *The Nurnberg Trial*, 6 F.R.D. 69, 76 (1946); Agreement by the Government of the United States of America, the Provisional Government of the French Republic, the Government of the United Kingdom of Great Britain and North Ireland and the Government of the Union of Soviet Socialist Republics for the Prosecution and Punishment of the Major War Criminals of the European Axis (London Agreement) arts. 4, 6, 59 Stat. 1544, E.A.S. No. 472 (August 8, 1945). Numerous individual defendants were convicted of "war crimes" and "crimes against humanity",[11] many of

**10.** The Court is aware that a great body of historical and legal literature exists which is critical of the purpose and conduct of the war trials of Nazi leaders at Nuremberg and of Japanese military leaders in the Pacific. Significant differences of opinion remain as to the propriety of those proceedings. It is a historical verity that the victors in war have meted out punishment to the vanquished in the name of justice. The Court does not pass judgment on this issue or the manner in which some of the post-war proceedings were conducted, leaving that verdict to time and its observers, the historians. It is, nonetheless, well-established that extraterritorial offenses were tried by these tribunals without objection by members of the international community.

**11.** The definition of these crimes, as set forth in Article 6 of the Charter annexed to the London Agreement almost exactly parallels the Nazi statute. The Charter provides in relevant part:

The Tribunal established by the Agreement referred to in Article 1 hereof for the trial and punishment of the major war criminals of the European Axis countries shall have the power to try and punish persons who, acting in the interests of the European Axis countries, whether as individuals or as members of the organizations, committed any of the following crimes.

The following acts, or any of them, are crimes coming within the jurisdiction of the Tribunal for which there shall be individual responsibility:

. . . . .

(b) War Crimes: namely, violations of the laws or customs of war. Such violations shall include, but not be limited to, murder, ill-treatment or deportation to slave labor or for any other purpose of civilian population of or in occupied territory, murder or ill-treatment of prisoners of war or persons on the seas,

which were committed outside of the territory of the four Allies. The international community affirmed and endorsed the work of the tribunals and the principles of law they envoked, through a General Assembly Resolution. G.A. Res. 95 (A/64/Add. 1) p. 188 (1946); *see also* Moeller, "United States Treatment of Alleged Nazi War Criminals: International Law, Immigration Law, and the Need for International Cooperation" (draft manuscript), to be published in 25 *Va.J. Int'l L.* (summer 1985).

In a number of cases brought before United States military tribunals, defendants accused of war crimes objected to the assertion of jurisdiction because the crimes were not committed on United States territory or in the United States territorial zone of occupation in Germany. These defenses were uniformly rejected. In asserting jurisdiction, the United States military courts discussed the universality of jurisdiction over war crimes. For example, in *United States v. Waldeck, et al.*, Case No. 000–50-9 (DJAWC, Nov. 15, 1947), the defendants were physicians, guards and officials of the Buchenwald concentration camp in Germany. They were, variously, charged with and found guilty of "killings, beatings, tortures, starvation" and other abuses. In finding jurisdiction over acts in violation of the law of war committed against the nationals of any country, at any place, prior to the entry of the United States into the war, the Court stated:

> Any violation of the law of nations encroaches upon and injures the interests of all sovereign states. Whether the power to punish for such crimes will be exercised in a particular case is a matter resting within the discretion of a state. However, it is axiomatic that a state, adhering to the law of war which forms a part of the law of nations, is interested in the preservation and the enforcement

thereof. This is true, irrespective of when or where the crime was committed, the belligerency status of the punishing power, or the nationality of the victims. (citations omitted)

*United States v. Waldeck*, at 34. *Accord United States v. Brust; United States v. Otto.*

Both France and Norway enacted legislation which provided for the trial of war criminals who committed extraterritorial offenses against their nationals or their state interests. *See* Baxter, "Jurisdiction Over War Crimes and Crimes Against Humanity: Individual and State Accountability", Bassiouni and Nanda (eds.) II *International Criminal Law* at 65, 67–68 (1973). No evidence has been presented or found which indicates that the international community objected to the Allies' assertion of jurisdiction over extraterritorial war crimes and crimes against humanity.

The work of the United Nations and its various organizations after World War II further shows the interest of the international community in the prosecution of war crimes, including crimes against humanity, which occurred in execution of or in connection with other war crimes. At the request of the United Nations General Assembly, the International Law Commission of the United Nations formulated "Nuremberg Principles", Report of the International Law Commission covering its Second Session, 5 U.N. GAOR, Supp. 12, pt. 111, U.N. Doc. A/1316 (1950), which described crimes against peace, war crimes, and crimes against humanity as "international crime[s]." *See also* Appleman, *Military Tribunals and International Crimes* 368–72 (1954). In addition, the United Nations Convention on the Prevention and Punishment of the Crime of Genocide, 78 UN.T.S. 277 (opened for signature December 9,

---

killing of hostages, plunder of public or private property, wanton destruction of cities, towns or villages, or devastation not justified by military necessity:
(c) Crimes Against Humanity: namely, murder, extermination, enslavement, deportation, and other inhumane acts committed against

any civilian population, before or during the war, or persecutions on political, racial or religious grounds in execution of or in connection with any crime within the jurisdiction of the Tribunal, whether or not in violation of the domestic law of the country where perpetrated. . . .

1948) [hereinafter "Genocide Convention"], was adopted by the United Nations General Assembly in 1948, G.A. Res. 260(A), U.N. Doc. A/810 at 174 (1948) and has been ratified by 93 nations.[12] The Convention "confirms" that genocide is "a crime under international law" and defines genocide to include various acts, including "killing" and "causing serious bodily or mental harm" which were committed "with intent to destroy ... a national, ethnical, racial or religious group". Convention, arts. 1, 2. The Contracting Parties undertake "to prevent and to punish" genocide. Convention, art. 1.

■ Respondent states that no jurisdiction arises under the principle of universality. He argues that only Congress, pursuant to the United States Constitution Article I, section 8, clause 10 (power to define offenses against the laws of nations), or the President, with the advice and consent of the Senate, pursuant to Article II, section 2, clause 2 of the Constitution (treaty-making power) has the power to "define a universal crime." Motion to Terminate at 16–17. Respondent claims that "the Laws of Nations cannot be broadly applied as a basis for federal jurisdiction over a case." *Id.* at 18. Respondent mischaracterizes the issue pertaining to universality. This Court must only determine whether Israel can assert jurisdiction over the alleged offenses, not whether Congress has defined the offenses as universal crimes or whether a United States court could try respondent for the alleged crimes under United States law. This Court has jurisdiction to conduct an *extradition* proceeding, pursuant to 18 U.S.C. § 3184. Order of February 21, 1985; Order of March 8, 1985.

Respondent cites no authority to show that Israel would violate international law in the instant case by asserting jurisdiction over respondent based on the universality principle. Israel has brought charges of "murder" against Demjanjuk, asserting jurisdiction based on a statute which penalizes "war crimes" and "crimes against humanity", among other acts. The international community has determined that these offenses are crimes over which universal jurisdiction exists. *Supra* at 21–26. Moreover, Israel's assertion of jurisdiction does not impinge or interfere with any other state's jurisdiction since no other nation has requested respondent's extradition.

A colorable argument has been made that Israel has jurisdiction to try respondent, based on the "protective" and "passive personality" theories of jurisdiction. The Court, however, need not determine whether Israel's assertion of jurisdiction on these bases is in conformity with international law because the Court finds that Israel has properly asserted jurisdiction under international law, pursuant to the universality principle.[13]

---

**12.** The United States has signed the Convention but, to date, has not ratified it. Despite the activism of the United States delegation in promoting the Convention (and lobbying, against the Soviet Union, for the inclusion of political groups as a protected class from oppression), the Senate entertained arguments that under the Constitution genocide was a purely "domestic matter." L. Kuper, *Genocide* 29–30 (1981). In addition, there was fear among some Senators that the United States would be charged with genocidal violations for segregationist laws or policies against blacks in America. Latter-day critics of the Convention may believe continued opposition to its ratification is merited given charges that United States involvement in the Vietnam War rises to genocidal proportions. *See* R. Falk, *Crimes of War* (1971); *From Nuremburg to My Lai* (ed. J. Baird 1972). In any event, it would seem that United States non-ratification of the Genocide Convention has largely been motivated by fear of domestic political repercussions rather than any fundamental disagreement with the core meaning or purpose of the Convention.

**13.** Israel may be able to assert jurisdiction to try respondent, pursuant to the Nazi statute based on the "protective" principle. International law has recognized a state's right to punish certain conduct occurring outside its territory by persons who are not its nationals when the conduct is directed against the security of the state or against important state interests or functions. Restatement § 402(3) and § 402 Comment (d). The regulated actions must have a demonstrable, adverse affect on the regulating state in particular, or at least a potentially adverse affect on that state. *United States v. James-Robinson*, 515 F.Supp. 1340, 1345 (S.D.Fla.1981). The crimes subject to such jurisdiction have included: espionage, counterfeiting of the state's seal

## B. Charges Within the Treaty

Respondent argues that the crimes he is charged with do not "conform to the letter or intent of the U.S.-Israel Extradition Treaty." Motion to Terminate at 23. He argues that:

... The alleged "crime against the Jewish people" does not in any way conform to the letter or intent of the U.S.-Israel Extradition Treaty (14 U.S.T. 1708). The list of Extraditable Crimes under Article II of the Treaty exhibits no language encompassing war crimes, genocide, crimes against "persecuted people" or persecuted nationalities. The specific acts and intent which must be demonstrated under the Law of Israel (*Nazi and Nazi Collaborators (Punishment Law)*, in order to confer extraterritorial jurisdiction, under Israeli Domestic Law, and in Israel's view under the substantive International Law, automatically eliminate the Israeli charge and the acts supporting the charge, from the category of statutory murder. The crime of murder set out in Article II of the Treaty excludes the elements of the offense of genocide or war crimes....

Motion to Terminate at 23. The Treaty provides, in relevant part:

### Article I

Each Contracting Party agrees, under the conditions and circumstances established by the present Convention, reciprocally to deliver up persons found in its territory who have been charged with or convicted of any of the offenses mentioned in Article II of the present Convention committed within the territorial jurisdiction of the other, or outside thereof under the conditions specified in Article III of the present Convention.

### Article II

Persons shall be delivered up according to the provisions of the present Convention for prosecution when they have been charged with, or to undergo sentence when they have been convicted of, any of the following offenses:

1. Murder.

2. Manslaughter.

3. Malicious wounding; inflicting grievous bodily harm....

or currency, the falsification of official documents, perjury before consular officials and conspiracies to violate a state's immigration or customs laws. Restatement § 402, Comment (d).

United States statutes and courts have recognized the protective principle's validity in several contexts. Restatement § 403 Reporters' Note 7. *See e.g., United States v. Pizzaruzzo,* 388 F.2d 8 (2d Cir.1968), *cert. denied,* 392 U.S. 936, 88 S.Ct. 2306, 20 L.Ed.2d 1395 (1968) (knowingly making a false statement on a visa application to enter the United States); *Rocha v. United States,* 288 F.2d 545 (9th Cir.1961), *cert. denied,* 366 U.S. 948, 81 S.Ct. 1902, 6 L.Ed.2d 1241 (1961), (sham marriages abroad to make unlawful entries as immigrants). In recent years, United States courts have used the principle to uphold extraterritorial jurisdiction over narcotics traffickers. *Accord United States v. Postal,* 589 F.2d 862, 886 n. 39 (5th Cir.1979); *United States v. King,* 552 F.2d 833, 851 (9th Cir.1976) *cert. denied,* 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977); *United States v. Angola,* 514 F.Supp. 933 (S.D.Fla.1981). *See also* Note, "Trends in Extraterritorial Narcotics Control: Slamming the Stable Door After the Horse has

Bolted", 16 *N.Y.U.J.Int'l L. & Pol.* 353, 374–90 (1984). These courts have reasoned that vessels in close proximity to the United States, full of illegal drugs, represent a real potential for harm to the effective administration of United States' customs and narcotics laws, which reflect a strong governmental interest. *United States v. Angola,* 514 F.Supp. at 936.

In the instant case, it has been argued that important state interests of Israel were affected by the acts alleged. Brief of *Amicus Curiae* (The International Human Rights Law Group) (filed April 10, 1984) at 42–45.

Israel may be able to assert jurisdiction based on the "passive personality" theory. Under that theory, a state may, in certain circumstances, apply its criminal law to an act committed outside its territory by a person not its national, because the victim of the act was its national. Restatement § 402, Comment (e); *id.* The validity of this theory in international law is in doubt. Restatement § 402, Comment (e). And, the victims of the alleged crimes were, of course, not Israeli citizens. Nonetheless, it is possible that Israel may assert jurisdiction here because of its close nexus with the victims. *See* Brief of *Amicus Curiae* at 42–44.

### Article III

When the offense has been committed outside the territorial jurisdiction of the requesting Party, extradition need not be granted unless the laws of the requested Party provide for the punishment of such an offense committed (in similar circumstances....

Respondent is correct in asserting that the crimes for which Demjanjuk is charged must fall within the treaty provisions for Demjanjuk to be found extraditable.

The Arrest Warrant-Exhibit J charges respondent with "Crimes against the Nazi and Nazi Collaborators (Punishment) Law, 5710–1950". The Warrant Request-Exhibit J more fully sets forth the charges:

Details of the offense(s): The suspect, nicknamed "Ivan the Terrible", was a member of the S.S., and in the years 1942–1943 operated the gas chambers to exterminate prisoners at the Treblinka death camp in the Lublin area of Poland, which was occupied by the Nazis during the Second World War. The suspect murdered tens of thousands of Jews, as well as non-Jews, killing them, injuring them, causing them serious bodily and mental harm and subjected them to living conditions calculated to bring about their physical destruction. The suspect committed these acts with the intention of destroying the Jewish people and to commit crimes against humanity.

Paragraph(s) of the charges: Paragraphs 1, 2, 3, and 4 of the Nazi and Nazi Collaborators (Punishment) Law, 5710–1950.

In addition, the eyewitness statements in the Israeli Extradition Request allege specific instances of killings, beatings, and injuries inflicted by respondent.[14]

For the reasons set forth below, this Court finds that some of the charges alleged against Demjanjuk are offenses for which he is extraditable under Article III of the Treaty and are offenses mentioned in Article II of the Treaty.

**14.** See *infra* at 564–566.

### 1. Extraditable Charges.

■ Demjanjuk is charged with murdering thousands of Jews and non-Jews while operating the gas chambers to exterminate prisoners at Treblinka. Warrant Request-Exhibit J. The Government's Complaint states that respondent "is duly and legally charged with having committed the crimes of murder and malicious wounding; inflicting grievous bodily harm" and that the said crimes are "among the offenses enumerated in Article II" of the Treaty. This Court finds that Israel seeks Demjanjuk's extradition for trial on charges of murder, pursuant to sections 1(b) and 2(f) of the Israeli Statute, and that those charges are recognized as crimes under Article II of the Treaty.

In addition to the charges of multiple murder, the Warrant Request-Exhibit J and Arrest Warrant-Exhibit J charge Demjanjuk with a number of other crimes, pursuant to the Israeli Statute, sections 1–4. Implicitly recognizing that extradition is limited to offenses set forth in Article II of the Treaty, the United States Attorney for the Northern District of Ohio has requested Demjanjuk's extradition only for the crimes of murder, manslaughter and malicious wounding; inflicting grievous harm. Government Complaint at 1; December Tr. at 40–44. Thus, the Court simply notes that Demjanjuk is non-extraditable for any of the other charges included in the Warrant Request-Exhibit J and Arrest Warrant-Exhibit J.

Furthermore, bars to extradition are normally discussed *after* a party is found otherwise extraditable. In the interest of clarity, however, the Treaty's time-bar, Article V(3), (its reference to statutes of limitations) is addressed at this point. Article V(3) of the Treaty provides, in relevant part, that when the prosecution of a person would be barred by lapse of time according to the laws of the requested party, had the offense been committed in its territory, extradition shall not be granted. As the Government has acknowledged, Government's Prehearing Memorandum (April 19,

1984) at 50; March Tr. at 22, prosecution today on charges of manslaughter and causing grievous bodily harm stemming from acts that occurred during 1942 to 1944 would be barred by statutes of limitations in the United States and Ohio. 18 U.S.C. § 3282; Ohio Revised Code § 2901.13. Extradition on those charges is barred. There are no applicable statutes of limitations for the crime of murder in the United States. 18 U.S.C. § 3281; Ohio Revised Code § 2901.13. Article V(3) does not bar extradition for murder.

## 2. Article III.

Article III is applicable when the offense charged is included in Article I and the offense was committed outside the territorial jurisdiction of the requesting state, in this case, Israel.[15] Respondent is accused of offenses which occurred in Poland. Because they were committed outside the territorial jurisdiction of Israel, Article III is applicable.

If the extraterritorial offense charged is punishable in the requested state "under similar circumstances", the requested state *must* extradite the accused subject to the other articles of the Treaty. If the offense charged is *not* prosecutable under the laws of the requested party, extradition "need not" be granted, *i.e.*, extradition is discretionary. Nonetheless, the extradition court must make a legal determination as to the accused's extraditability pursuant to the treaty involved and 18 U.S.C. § 3184. *Accord Assarsson*, 635 F.2d 1237, 1244–45 (7th Cir.1980); (interpretation of a virtually identical extraterritorial jurisdiction provision in the United States-Sweden Treaty of Extradition, 14 U.S.T. 1845; the United States Senate gave its advice and consent to the United States-Sweden Treaty on the same day as it considered the United States-Israel Treaty), *cert. denied*, 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 325 (1981); *Assarsson*, 687 F.2d 1157 (8th Cir.1982); *see also Shapiro v. Ferrandina*, 478 F.2d 894, 906 (2d Cir.1973), *cert. dismissed*, 414

U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973).

The United States does recognize the criminality of the alleged acts. The United States participated in the Nuremberg trials where individuals were punished for atrocities they had committed in exterminating civilian populations. *See e.g., The Nurnberg Trial*, 6 F.R.D. 69, 158–59, 160–61, 172–73 (defendants Frank, Frick, von Schirach). In addition, United States military tribunals tried individuals for the horrible acts they committed in concentrations camps. *See supra* at 557. Furthermore, both Congress and the Executive Branch, through the State Department, made clear that they regarded wholesale murder, torture and other inhumane treatment of civilians as prosecutable crimes. *See e.g.,* H.Con.Res. 39, 79th Cong., 1st Sess. (1945); "Punishment of War Criminals", 12 Dep't State Bull. 154 (1945). Current United States law, however, does not provide for the *trial* and *punishment* of persons accused of murdering civilians in Nazi concentration camps in Europe during World War II. "Similar circumstances", therefore, are lacking. Thus, the decision to extradite respondent is discretionary. Pursuant to Article III, it is the Court's duty to certify whether respondent can be extradited. The Executive branch must determine whether a respondent actually will be extradited.

## 3. Article II.

Demjanjuk argues that the murder charges alleged are not within the Treaty because the Treaty does not include war crimes, genocide or crimes against persecuted nationalities. This argument has no basis in either the Treaty or American legal principles.

First, the Treaty does not explicitly exclude murder of civilians occurring during wartime or motivated by racial or religious hatred. There is no reason to presume that the Treaty drafters intended to extradite for "murder" and not for "mass murders". *Cf. Factor v. Laubenheimer*, 290

---

**15.** The interpretation of this Treaty provision appears to be an issue of first impression.

U.S. 276, 298, 54 S.Ct. 191, 197, 78 L.Ed. 315 (1933). Extradition treaties historically have provided for the extradition of those accused of serious, rather than lesser, crimes. *See United States v. Rauscher,* 119 U.S. 407, 420, 7 S.Ct. 234, 240, 30 L.Ed. 425 (1886). Demjanjuk is certainly charged with very serious crimes—with offenses "against such laws as [are] essential to the protection of life, liberty, and person." *Id.* Governments have historically been very willing to deliver up to the appropriate authorities offenders of those laws. It is illogical to assume that the Treaty drafters intended to exclude mass murder, regardless of the motivation behind the murders, or how the murders are labelled. As the Supreme Court said in *Collins v. Loisel:*

> The law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions. (citations omitted).

259 U.S. 309, 312, 42 S.Ct. 469, 470–71, 66 L.Ed. 956 (1921). It is not material here that the Treaty does not refer to the crimes respondent is charged with in the same words as the Warrant Request.

Respondent's argument, based on his literal and technical reading of the Treaty and the charges, leads to an absurdity: that is, one who kills an individual is extraditable but one who kills many is not extraditable. Clearly, the law recognizes varying degrees of murder. But it is implicit that when one seeks to intentionally kill hundreds, he necessarily has the requisite intent to kill each individual. The destruction of a group presupposes the destruction of its individual constitutent members. Demjanjuk is charged with multiple murders, committed within the context of an over-all scheme of extermination. There is nothing in the Treaty to indicate that murders predicated on certain motives, such as racial or religious hatred, are non-extraditable. The motives for the commission of the

crimes are immaterial for the purpose of determining extraditability.[16] *See In the Matter of the Extradition of Andrija Artukovic,* Case No. CV–8743–R (B), slip op. at 9 (C.D.Cal. March 4, 1985).

Second, at the time the Treaty was prepared and signed, the Israeli Statute was in effect and persons had been prosecuted and convicted of extraterritorial crimes pursuant to the Israeli Statute. *See Attorney General v. Eichman,* 56 Am.J.Int'l 805; Comment, "Fedorenko v. United States: War Crimes, the Defense of Duress and American Nationality Law", 82 *Colum.L.Rev.* 120, 168 (1982) (cases discussed at note 156). The drafters could have excluded charges under this statute from the Treaty—or even all charges arising during the World War II period—had they wished to do so. Article 21 of the extradition treaty between Israel and Canada explicitly excludes "offenses committed or conviction which have taken place" before the treaty was signed. Extradition Agreement Between the Government of the State of Israel and the Government of Canada, [1970] U.N.T.S. 270 (entered into force December 19, 1969). The United States-Israel Treaty contains no such limitation or exclusion.

Third, the Assistant Legal Adviser for the Law Enforcement and Intelligence Section of the Department of State in Government Exhibit 4 has declared that "[t]he offense for which Mr. Demjanjuk's extradition [is sought] is covered by Article II of the Treaty ..." Such a declaration is not dispositive in judicial proceedings. Nevertheless, in resolving questions of treaty interpretation, statements by the United States Department of State are entitled to great weight. *Factor,* 290 U.S. at 295, 54 S.Ct. at 196; *Sayne v. Shipley,* 418 F.2d 679, 685 (Fifth Cir.1969), *cert. denied,* 398 U.S. 903, 90 S.Ct. 1688, 26 L.Ed.2d 61 (1970). In the instant case, the Court accepts the Executive branch's interpretation of Article II of the Treaty, finding it well-

**16.** See infra at 569–571 (discussion of the political offense exception).

founded and supported by the weight of legal authority.

Fourth, United States courts have clearly established that extradition treaties are to be liberally construed so as to effect the apparent intention of the parties. *Valentine v. U.S. ex rel. Neidecker,* 299 U.S. 5, 10, 57 S.Ct. 100, 103, 81 L.Ed. 5 (1936); *Factor,* 290 U.S. at 293–94, 54 S.Ct. at 195–96. Extradition treaties are intended to secure the surrender of alleged criminals so that they can be tried for the offenses charged. *See* 290 U.S. at 293, 54 S.Ct. at 195; *see also id.* at 318, 54 S.Ct. at 204 (Butler, J. dissenting). The surrender of such persons involves no impairment of any legitimate public or private interest. *Id.* at 298, 54 S.Ct. at 197. Rather, an obligation to extradite, in the interests of justice and friendly international relations, should be honored whenever possible. *Id.*

Thus, even if the Treaty here could fairly be interpreted to exclude mass murders, such an interpretation, which would restrict Israel's rights under the Treaty, is disfavored. *Accord Factor,* 290 U.S. at 294, 54 S.Ct. at 196. This Court's role is limited to certifying extraditability under the Treaty. It should be left to the Secretary of State and other members of the Executive Branch to ultimately determine whether to extradite respondent since the conduct of foreign affairs and United States relations with Israel are almost exclusively an executive function. *Accord Shapiro,* 478 F.2d at 906.

## V.

### PROBABLE CAUSE

The final function of the extradition court is to determine whether there is "competent and adequate evidence" or "probable cause" to believe respondent committed the acts with which he is charged. 18 U.S.C. § 3184; *Fernandez v. Phillips,* 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925); *Bingham v. Bradley,* 241 U.S. 511, 516–17, 36 S.Ct. 634, 637, 60 L.Ed. 1136 (1916); *Shapiro v. Ferrandina,* 478 F.2d 894, 904–05, 913–14 (2d Cir.), *cert. dismissed,* 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973); *Jimenez v. Aristequieta,* 311 F.2d 547, 562 (5th Cir. 1962).

■ The weight and sufficiency of that evidence to establish probable cause is for the determination of the committing court. *Gusikoff v. United States,* 620 F.2d 459, 462 (5th Cir.1980); *Garcia-Guillern v. United States,* 450 F.2d 1189, 1192 (5th Cir.1971). Once again, the Government and the requesting country are not required to show actual guilt, that the person sought committed the crime. The only requirement is that there be probable cause to believe the fugitive is guilty. "The extradition court does not inquire into the guilt or innocence of the accused. [It] looks only to see if there is evidence sufficient to show reasonable ground to believe the accused guilty." *Sayne v. Shipley,* 418 F.2d 679, 685 (5th Cir.1969).

■ In making a finding that probable cause exists for extradition, the Court is required to examine whether probable cause exists for each *specific charge* which forms the basis for extradition. Several courts have stated that such a determination is necessary in order to clearly resolve issues of dual criminality and specialty which arise in the interpretation of extradition treaties.[17] *Artukovic,* slip op. at 1;

17. The principle of specialty limits prosecution in the requesting country to those extraditable offenses established by the facts on which extradition has been granted by the asylum [requested] country. The dual criminality principle makes an offense non-extraditable unless it is criminal in both the requesting and the requested states' jurisdictions. *Caplan,* 649 F.2d at 1343. The Court has determined as will be discussed below that the common law principle of "dual criminality" is inapplicable to the in-

stant case since the U.S.-Israel extradition treaty governs. See *infra* at 569.

Article XIII of the Treaty incorporates the principle of specialty. It provides in relevant part, that

A person extradited under the present Convention shall not be detained, tried or punished in the territory of the requesting Party for any offense other than that for which extradition has been granted nor be extradited by that Party to a third State . . .

*Caplan v. Vokes,* 649 F.2d 1336, 1343–44 (9th Cir.1981); *Shapiro,* 478 F.2d 894, 905–09 (2d Cir.), *cert. dismissed,* 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973). The extradition record must demonstrate "coherent legal connections between the factual allegations and extraditable offenses." *Caplan,* 649 F.2d at 1344.

This Court has already determined that respondent is not extraditable for the offenses of "manslaughter and malicious wounding; causing grievous bodily harm" since those offenses are time-barred by the United States and the Ohio statute of limitations. *Supra* at 560. Since there is no comparable statute of limitation for the crime of "murder," the Court has determined that Article V(3)'s time bar does not prohibit respondent's extradition for murder. It is therefore necessary to establish the factual and legal nexus between the *acts* respondent is alleged to have committed and the *crimes* for which extradition is granted. *See Shapiro,* 478 F.2d at 907. That "legal nexus" constitutes the finding of probable cause the extradition court must make.

 The nature of the Court's inquiry into the identification of respondent required a probable cause determination which in many ways overlaps with the probable cause finding required here. In other words, the Court has already found that the eyewitness affidavits and supplementary statements establish probable cause to believe that respondent is the person accused and named in the Arrest Warrant. These same affidavits and supplementary statements also are sufficient to place the respondent at the site where the alleged crimes occurred, namely the Treblinka camp in the years 1942–43. However, the next step which must be taken is to identify those alleged acts which respondent committed while *at that site and at that time* and to determine whether those specific acts constitute the extraditable offense of murder.

The eyewitness testimony of Elijahu Rosenberg identifies respondent as a guard of the gas chamber at the Treblinka camp, where Rosenberg was a prisoner in 1942 and 1943. March Tr. at 27. Rosenberg identified respondent as one of two Ukranians who operated the gas chambers. March Tr. at 28. Rosenberg states that he himself saw respondent at the gas chambers "[e]very day, whenever there were transports." *Id.* at 29. He stated that after the respondent and the other guard herded prisoners into the gas chambers, "[t]hey returned to the room where the motor was, and they activated the motor." *Id.* at 29.[18]

It is known that the gas chambers at the various camps throughout Europe during the Nazi period were created for the express purpose of killing individuals as part of the Nazi's "Final Solution." Treblinka's principle purpose was to kill all the Jews from the Warsaw ghetto. W. Shirer, *The Rise and Fall of the Third Reich,* 968, 975, 978 (1960). Although experimentation with killing by asphyxiation had begun as early as 1941 (mobile killing vans), by 1942 at the Treblinka camp, the Nazis were using carbon monoxide gas from diesel engines, the fumes of which were introduced into a sealed chamber containing prisoners. Hydrogen cyanide was later chosen for use at Auschwitz when SS Commander Rudolph

Pursuant to Article XIII, respondent may be extradited to Israel only to stand trial for the offenses for which this Court has certified that there is probable cause to indicate that respondent committed the crimes. *Accord Shapiro,* 478 F.2d at 906–911; *see also Fiocconi v. Attorney General,* 462 F.2d 475 (2d Cir.1972); *United States v. Paroutian,* 299 F.2d 486 (2d Cir.1962).

18. Witness Rosenberg also testified that respondent beat and "tortured" prisoners with a whip, a sword and a pipe. March Tr. at 29. He does not specifically state the prisoners died from such acts. Since the Court has ruled that respondent cannot be extradited for "malicious wounding; grievous bodily harm," these acts of beating are not presented as factual elements in the probable cause determination for the extraditable offense of murder. Of course, such acts are properly within the scope of consideration for the United States Executive Branch in making its decision to extradite and the Israeli trial court in considering the degree of the crime and severity of punishment, if guilt is found, for the offense of murder.

Hoess determined that Treblinka's carbon monoxide method was not "very efficient," i.e. did not kill quickly enough. *See, e.g., United States v. Fedorenko,* 455 F.Supp. 893, 901–02 n. 12 (S.D.Fla.1978), *rev'd,* 597 F.2d 946 (5th Cir.1979), *reh'g denied,* 601 F.2d 1195, *aff'd on other grounds,* 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981); R. Hilberg, *The Destruction of the European Jews,* 219, 441, 561–72 (1961); Shirer, *supra,* at 967–69. Treblinka had 10 gas chambers which accommodated 200 people each. Shirer, *supra,* at 968. The Court describes the operations of these monstrous "gas chambers" in order to make it clear that if respondent activated the motor for the gas chamber, as Rosenberg notes, then there is probable cause to believe he committed murder since: (i) these chambers were specifically created for the purpose of killing; and (ii) death by asphyxiation is a foreseeable consequence of the inhalation of carbon monoxide.

Witness Rosenberg has stated that dead bodies were removed from the gas chambers approximately half-an-hour to an hour after the motor was activated. March Tr. at 28, 32. Rosenberg stated in his supplemental affidavit that he removed "with his own hands" the bodies of his first cousin, Devora Shifran, and his neighbor, Efraim Weinstein, from the gas chamber. March Tr. at 32. Rosenberg did not specifically state that respondent was operating the gas chamber at the time Shifran and Weinstein were gassed, but since only two Ukranians have been identified as operating the chambers, it may be inferred for the purpose of determining probable cause that respondent was operating the chamber at the time of Shifran and Weinstein's death.

Witness Rosenberg in his supplemental statement made under oath before a magistrate in Jerusalem also stated that "[a]t the Treblinka camp, many persons were also murdered outside the gas chambers." He could not recall the names but he mentioned the case of his cousin David Auslander. March Tr. at 31. Rosenberg states that respondent took a sword and cut off the ear of Auslander as Auslander was taking a corpse to the burial pit. Rosenberg said that Auslander did not return from the burial pit. "By cutting off my cousin's ear, Ivan, in effect, caused his death." *Id.* Although witness Rosenberg did not see Auslander actually die, Rosenberg stated that any prisoner who appeared wounded would be shot to death when he appeared at the edge of the pit. Government Exhibit 3, Statement of Elijahu Rosenberg (item ER/2) at 1. Therefore, the Court finds sufficient evidence to conclude that probable cause exists for charging respondent with the murder of David Auslander. Issues of medical and legal causation are for the trial court to determine.

Witness Pinhas Epstein has also stated that he saw the gas chambers at Treblinka in 1942–43 operated by two Ukranians, one of whom was respondent. March Tr. at 34. Epstein states that he also observed Ivan entering and operating the engine room. March Tr. at 38. He identifies six members of his family, including his parents and siblings, who were killed in the gas chambers. March Tr. at 38. Witness Epstein in his supplemental affidavit sworn to a magistrate in Jerusalem on February 5, 1984 described seeing respondent beat prisoners with an iron pipe "to split the heads of a number of prisoners ... [with the result that] the brains of these victims [were] spilling out on the ground and that Ivan killed him [sic] with his blows." Epstein specifically identified Zigmond Eleibaum as one of these victims killed by blows to the head. March Tr. at 37.

Epstein also states that respondent hung three prisoners after torturing them, including Michelle and Moishe. "I wish to make it clear that Ivan took part in hanging these three and that they were hung by a rope to a tree until they died. I, myself, saw that these three were killed in this way." March Tr. at 37.

Witness Joseph Czarny, who was a prisoner at Treblinka from 1942 to 1943, in a statement at National Police Headquarters in Tel Aviv on September 21, 1976, stated that he saw respondent at Treblinka "con-

vey[ing] people into the gas chambers." Czarny also states that he saw respondent and "Lalka, Kurt Franz [shoot] people dead." March Tr. at 43. Czarny stated that he saw respondent shoot a "carrier [of a] dead person" after respondent had cut off the carrier's ear. March Tr. at 46.

It is unnecessary to pass on every shred of evidence detailing eyewitness accounts of acts allegedly committed by respondent which can support a probable cause finding. The quantity of evidence necessary for a determination of probable cause, as well as its weight and sufficiency, is a matter for the extradition court's discretion. *Gusikoff,* 620 F.2d at 462. It is enough in this case, after examining the statements of just three witnesses, to conclude that there is sufficient evidence to find probable cause that respondent, while serving as a guard at the Treblinka camp in 1942–1943, committed murders of: (i) uncounted numbers of prisoners, including Shifran, Weinstein, and members of Epstein's family, who died of asphyxiation in the gas chambers which respondent operated; (ii) David Auslander, Elijahu Rosenberg's cousin, who may have bled to death

or been shot after his ear was cut off by respondent; (iii) Zigmond Eleibaum, who died from blows to the head, as seen by Epstein; (iv) Michelle, Moishe and a third prisoner who were hung by respondent, as observed by Epstein; (v) the carrier of corpses who was shot by respondent, as stated by Czarny. In sum, the Court finds from a review of the evidence submitted that probable cause exists to believe respondent committed multiple acts of murder and that he may be extradited to Israel for those murders. ·

## VI.

### DEFENSES

All of the prerequisites for extradition pursuant to the Treaty and 18 U.S.C. § 3184 have been met. Thus, the only remaining issue before this Court is whether this case falls within any of the provisions of the Treaty which prohibit or limit extradition. Respondent has raised several defenses to a finding of extraditability. As will be shown below, these defenses lack merit.[19]

---

**19.** In addition to the four defenses discussed in the text, Demjanjuk claims:

(i) That his extradition is prohibited by the time-bar included in Article VI(3). This argument is valid with respect to some of the charges alleged and has been discussed above. *See supra* at 30.

(ii) That he is not a "fugitive" because he has never been in the State of Israel nor did he flee from that jurisdiction. This argument is rejected. Israel may assert jurisdiction over Demjanjuk, even if he is not an Israeli citizen. *See* Article IV; *Eain v. Wilkes,* 641 F.2d 504 (7th Cir.1981) (Palestinian terrorist who was a citizen of neither the United States nor Israel extradited to Israel, pursuant to the Treaty). The propriety of Israel's assertion of jurisdiction in the instant case has been discussed in detail above. Israeli jurisdiction does not rest on the physical location of the alleged perpetrator. Furthermore, Demjanjuk's claim that he is not a fugitive and, thus, is non-extraditable lacks merit. *In re Ryan,* 360 F.Supp. 270, 272 n. 4 (E.D.N.Y.1973); *United States ex rel. Eatessami v. Marasco,* 275 F.Supp. 492, 496 (S.D.N.Y.1967).

(iii) That his extradition is barred by Article VII of the Treaty because the Israeli Statute provides for the imposition of the death penalty. Article VII provides that:

When the offense for which the extradition is requested is punishable by death under the laws of the requesting Party and the laws of the requested Party do not permit such punishment for that offense, extradition may be refused unless the requesting Party provides such assurances as the requested Party considers sufficient that the death penalty shall not be imposed, or, if imposed, shall not be executed.

The United States and the State of Ohio allow the death penalty to be imposed for murder of the type and magnitude alleged. 18 U.S.C. § 1111 (murder designated a capital offense); Ohio Code § 2929.02; *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). Thus, Article VII may not be applicable. Even if Article VII is deemed to apply, making extradition discretionary, the decision to actually extradite rests in the Executive branch. Article VII cannot be read as a bar to certification of extradition. The Court merely notes at this point that the Executive branch may want to take into account the humanitarian concerns behind Article VII in deciding whether to seek assurance from the State of Israel that Demjanjuk will be fairly treated in all respects, before Demjanjuk is surrendered.

## A. Israeli Statute is not Ex Post Facto

Respondent argues that Demjanjuk is not extraditable under 18 U.S.C. § 3184 because the Israeli statute breaches Israel's obligations in international law and violates the United States Constitution because the statute is *ex post facto. See* Motion to Terminate at 7–11. Respondent's arguments and conclusion are erroneous.

Under international law, a law which renders an act criminal when the act was not criminal at the time it was committed may be a forbidden *ex post facto* law. This issue need not be reached today because the Nazis and Nazis Collaborators (Punishment) Law is *not* an *ex post facto* law. The Israeli statute does not declare unlawful what had been lawful before; rather, it provides a new forum in which to bring to trial persons for conduct previously recognized as criminal. Defendants prosecuted under the statute would have been subject to the criminal jurisdiction of the state where the acts occurred, as well as the jurisdiction of the Allies' military tribunals and possibly German courts. *See supra* at 20–24; Order of March 8, 1985 at 10–12.

Respondent is charged with offenses that were criminal at the time they were carried out. At the time in question, the murder of defenseless civilians during wartime was illegal under international law. The Hague Conventions of 1899 and 1907 Respecting the Laws and Customs of War on Land, 32 Stat. 1779, *signed* July 29, 1899, *ratified* (by the United States) April 9, 1902; 36 Stat. 2199, *signed* October 18, 1907, *ratified* (by the United States) November 27, 1909, both expressly forbid the killing of defenseless persons, even when they are enemy nationals, article 23(b), (c), and forbid "general penalties" against populations, article 50. The Convention's rules were binding on parties to the Convention, including Germany, and, by 1939, were recognized by all civilized nations and regard-

ed as declaratory of the laws and customs of war.[20] *The Nurnberg Trial,* 6 F.R.D. at 131; *see also* London Agreement *supra* at 22, "Moscow Declaration of German Atrocities", 9 Dep't State Bull. 310 (November 1, 1943) (signed by Roosevelt, Churchill, Stalin); "Crimes Against Civilian Populations in Occupied Countries", 7 Dep't State Bull. 709, 710 (1942) (statement by President Roosevelt) (Allied declarations about the criminality under law of acts being perpetrated on civilian populations). Furthermore, it is absurd to argue that operating gas chambers, and torturing and killing unarmed prisoners were not illegal acts under the laws and standards of every civilized nation in 1942–43. Murder is *malum in se. See Fedorenko,* 455 F.Supp. at 901–02 n. 12 (discussion of Treblinka death camp's operations).

The Israeli statute merely provides Israeli courts with jurisdiction to try persons accused of certain crimes committed extraterritorially and establishes judicial procedures and applicable penalties. *See Calder v. Bull,* 3 Dall. (U.S.) 386, 390–93, 1 L.Ed. 648 (1797) (discussion of *ex post facto* laws, as prohibited in the United States Constitution); *Cook v. United States,* 138 U.S. 157, 183, 11 S.Ct. 268, 275, 34 L.Ed. 906 (1891). Similarly, the Nuremberg International Military Tribunal provided a new forum in which to prosecute persons accused of war crimes committed during World War II pursuant to an agreement of the wartime Allies, *see The Nurnberg Trial,* 6 F.R.D. 69. That tribunal consistently rejected defendants' claims that they were being tried under *ex post facto* laws. *Id.; see also United States v. Waldeck; United States v. Otto; United States v. Brust.* The statute is not retroactive because it is jurisdictional and does not create a new crime. Thus, Israel has not violated any prohibition against the *ex post facto* application of criminal laws which may exist in international law.[21]

---

**20.** Because the atrocities charged occurred during World War II, the Court need not reach the question of whether crimes committed against civilian populations before World War II are prohibited under international law. *See* 6 F.R.D. at 13.

**21.** Respondent's argument that the Israeli statute violates the United States Constitution's pro-

Furthermore, contrary to Demjanjuk's assertions, *Motion to Terminate* at 9, the Israeli statute does not breach Israel's international obligations because the acts alleged preceded the independence of the State of Israel. The criminal law defining and prohibiting murder in the State of Israel today incorporates the 1936 Criminal Code which was in effect in Palestine, pursuant to the authority of the United Kingdom, as Mandatory Power for Palestine under the League of Nations. *See* Rosenne, "The Effect of Change of Sovereignty on Municipal Law, [1950] Brit.Y.B. Int'l L. 267, 284–85. Thus, Israeli courts have asserted the right to try persons accused of committing crimes before Israel's independence, as courts of a successor state. *Accord Attorney General v. Eichman*, 56 *Am.J.Intl.* at 833. This is consistent with United States law, which provides that laws "designed to secure good order and peace in the community, ... which are strictly of a municipal character" remain in force after a change in government, until the new government acts to alter or repeal the legislation. *Chicago, Rock Island & Pacific Ry. v. McGlinn*, 114 U.S. 542, 546, 5 S.Ct. 1005, 1006, 29 L.Ed. 270 (1885). Because the 1936 Criminal Code prohibited murder and because the Mandatory Power could have enacted a law providing for the prosecution of extraterritorial war crimes, Israel, as the successor state, can try persons for murders committed during the time of the British Mandate. Thus, Israel's

statute is not jurisdictionally defective because it was promulgated after Israel became a State.

 There is nothing in the Treaty to indicate that it is not applicable to crimes committed before Israeli statehood. An extradition treaty is to be given retroactive effect, absent an explicit reference in the treaty to the contrary. *Gallina v. Fraser*, 177 F.Supp. 856, 864 (D.Conn.1959), *aff'd* 278 F.2d 77 (2d Cir.1960), *cert. denied* 364 U.S. 851, 81 S.Ct. 97, 5 L.Ed.2d 74 (1960), *reh'g denied*, 364 U.S. 906, 81 S.Ct. 238, 5 L.Ed.2d 199 (1960). The Treaty does not contain any prohibition against Israel's assertion of jurisdiction over crimes committed during World War II, or crimes committed prior to the time Israel became a state. There is no evidence that the drafters intended to exclude such crimes and no legislative history to indicate that the United States Senate intended the Treaty to be so interpreted. Senate Report of Proceedings, Senate Comm. on Foreign Relations, Convention with Israel at 51–59 (September 25, 1963). Again, murder is *malum in se.* It is illogical to assume that an alleged criminal is not extraditable and, thus, will not be tried for a crime as serious as murder because the crime was committed before the requesting state obtained statehood. Thus, pursuant to the Treaty, the United States is obligated to extradite persons for crimes committed prior to the time Israel became an independent state. Isra-

---

hibition against *ex post facto* laws is misplaced. This Court does not have jurisdiction to determine whether Israeli criminal procedure extends to respondent all of the constitutional rights of a defendant in an American court. Due process rights cannot be extended extraterritorially. *Neely v. Henkel*, 180 U.S. 109, 21 S.Ct. 302, 45 L.Ed. 448 (1901); *Kamrin v. United States*, 725 F.2d 1225, 1228 (9th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 85, 83 L.Ed.2d 32 (1984); *In the Matter of the Extradition of Andrija Artukovic*, CV84–8743 (C.D.Cal., March 5, 1985). This Court is "bound by the existence of an extradition treaty to assume that the trial will be fair." *Glucksman v. Henkel*, 221 U.S. 508, 512, 31 S.Ct. 704, 55 L.Ed. 830 (1911) (J. Holmes). As the Second Circuit held in *Rosado v. Civiletti*, 621 F.2d 1179, 1193 (2d Cir.1980),

Even where the treaty fails to secure to those who are extradited to another country the

same constitutional safeguards they would enjoy in an American criminal trial, it does not run afoul of the Constitution.

*See also Holmes v. Laird*, 459 F.2d 1211 (D.C.D. C.1972), *cert. denied*, 409 U.S. 869, 93 S.Ct. 197, 34 L.Ed.2d 120 (1972). If there is any discretion not to extradite because of dangers of an unfair trial or persecution, such discretion rests in the Executive branch. Restatement of the Foreign Relations Law of the United States (Revised), Tentative Draft No. 5 (1984) § 386 Comment g.

The Court notes, without deciding, that in all likelihood, the Israeli statute would not be a constitutionally prohibited *ex post facto* law. *Accord Calder v. Bull*, 3 Dall. (U.S.) 386, 390, 1 L.Ed. 648 (1797); *Cook v. United States*, 138 U.S. 157, 183, 11 S.Ct. 268, 275, 34 L.Ed. 906 (1891).

el's lack of statehood during World War II is not a defense to extradition.

### B. Treaty's "Double Jeopardy" Provision Does Not Bar Extradition.

Article VI of the Treaty provides that extradition shall not be granted:

1. When the person whose surrender is sought is being proceeded against, or has been tried and discharged or punished, in the territory of the requested Party for the offense for which is extradition is requested.

Respondent argues that this provision bars his extradition because the United States government currently is seeking his deportation, based on the same alleged acts and evidence relied on in the Extradition Request. Defendant's Supplemental Outline Regarding Issues (February 4, 1984) at 10.

This Treaty provision, however, applies only to criminal proceedings in the requested country. *Sindona v. Grant*, 619 F.2d 167 (2d Cir.1980) (test for treaty "double jeopardy" protection is "whether the same conduct or transaction underlies the *criminal charges* in both transactions") (emphasis added); *Stowe v. Devoy*, 588 F.2d 336, 340 (2d Cir.1978) (only double jeopardy problem if the requested person has been or is being tried and subject to punishment for the offense in question), *cert. denied*, 442 U.S. 931, 99 S.Ct. 2862, 61 L.Ed.2d 299 (1979). Neither denaturalization nor deportation proceedings are criminal prosecutions. *Schneiderman v. United States*, 320 U.S. 118, 160, 63 S.Ct. 1333, 1353, 87 L.Ed. 1796 (1943) ("denaturalization suit is not a criminal proceeding"), *reh'g denied*, 320 U.S. 807, 64 S.Ct. 24, 88 L.Ed. 488 (1943); *Fedorenko v. United States*, 449 U.S. 490, 516, 101 S.Ct. 737, 752, 66 L.Ed.2d 686 (1981) ("a denaturalization action is a suit in equity"); *Fong Yue Ting v. United States*, 149 U.S. 698, 730, 13 S.Ct. 1016, 1028, 37 L.Ed. 905 (1893) ("deportation is not a punishment for crime"); *Oliver v. I.N.S.*, 517 F.2d 426, 428 (2d Cir.1975) ("deportation, however severe its consequences, has been consistently classified as a civil rather than a criminal procedure"),

*cert. denied*, 423 U.S. 1056, 96 S.Ct. 789, 46 L.Ed.2d 646 (1976). No evidence has been presented that respondent has been tried or convicted for the crimes alleged in the United States or in any third country, *see* Article VI § 2. Thus, the Treaty's "double jeopardy" prohibition is inapplicable.

### C. "Dual Criminality" Principle Inapplicable.

▉ Respondent argues that for each offense charged, the act committed must be criminal in both Israel and the United States before extradition may be permitted. Motion to Terminate Proceedings at 5, 20. The common law rule of "dual criminality" is inapplicable to the instant case. In the United States, extradition is governed by treaty. *Factor*, 290 U.S. at 287, 54 S.Ct. at 193. Thus, that the offense charged is not a *prosecutable* crime in the United States is not necessarily a bar to extradition. *Assarsson*, 635 F.2d at 1245. If the extradition treaty so provides, the United States may surrender a person to be prosecuted for acts which are not crimes in the United States. *Id.* (quoting *Gallina v. Fraser*, 278 F.2d 77, 79 (2d Cir.1960); *Factor*, 290 U.S. at 294–01, 54 S.Ct. at 196–98. The crimes charged do fall within the Treaty. *Supra* at 559. Thus, the language of the Extradition Treaty is controlling. The Treaty refutes respondent's claim that lack of "dual criminality" bars extradition.

### D. "Political Character" Offense Exception Not a Bar.

Article VI(4) of the Treaty states that extradition shall not be granted

[W]hen the offense is regarded by the requested Party as one of a political character or if the person sought proves that the request for his extradition has, in fact, been made with a view to trying or punishing him for an offense of a political character.

Respondent argues that, even if he is otherwise extraditable

these alleged acts are clearly political in character. At the time of their alleged commission, there was a war and these

alleged acts, no matter how barbaric or horrifying, were incidental to the Nazi War effort.

Motion to Terminate at 34.

While the Treaty does include a clause prohibiting extradition for political offenses, the evidence in this case does not support respondent's allegation that Israel seeks to try him for "political crimes." [22]

█ For an act to fall within the political offense exception to the Treaty, the Court must determine that there was a violent political disturbance, such as a war, revolution or rebellion, at the time and place of the alleged act and that the acts charged were recognizably incidental to the disturbance. *Accord Eain v. Wilkes*, 641 F.2d 504, 516, 518 (7th Cir.1981). *See Ornelas v. Ruiz*, 161 U.S. 502, 16 S.Ct. 689, 40 L.Ed. 787 (1896); *In re Castioni*, 1 Q.B. 149 (1891). The definition of "political disturbance" is aimed at acts which disrupt the political structure of a State and not the social structure that established the State. *Eain v. Wilkes*, 641 F.2d 520–21. In determining whether a rational nexus exists between the alleged crimes and the political disturbance, the focus of inquiry is on the circumstances and the status of those harmed and not merely on whether the acts were committed during the disorder. *Artukovic*, slip op. at 6; *See Ornelas v. Ruiz*, 161 U.S. at 511, 16 S.Ct. at 692 (1896).

The murder of Jews, gypsies and others at Treblinka was not part of a political disturbance or struggle for political power within the Third Reich. The murders were committed against an innocent civilian population in Poland after the invasion of Poland was completed. No allegations have been advanced, or could be sustained, claiming that those Jews and non-Jews killed were part of an active attempt to change the political structure or overthrow the occupying government. *Cf. Fedoren-*

*ko*, 455 F.Supp. at 901–02 n. 12 (discussion of Treblinka's death camp operations).

Rather, the members of an innocent civilian population were the intended victims of the "Final Solution". The alleged crimes were committed without regard for the political affiliations or governmental or military status of the victims. *Accord Eain v. Wilkes*, 641 F.2d at 522. The civilian status of the victims is also significant because the United States does not regard the indiscriminate use of violence against civilians as a political offense. *Accord Ornelas v. Ruiz*, 161 U.S. at 511, 16 S.Ct. at 692; *Eain v. Wilkes*, 641 F.2d at 521.

Respondent's claim that the killing of defenseless civilians at Treblinka was part of the Nazi war effort, and therefore is political in character, is frivolous and offensive. In any event, mere simultaneity between the alleged murders at Treblinka and World War II is insufficient to render the offense "political" within the meaning of the Treaty. *See Eain v. Wilkes*, 641 F.2d at 521.

In another recent extradition case, involving members of the Provisional Irish Republican Army, the political offense exception to the Treaty of Extradition between the United States of America and the United Kingdom of Great Britain and Northern Ireland, 28 U.S.T. 227 (1977), was construed to require only

that no act be regarded as political where the nature of the act is such as to be violative of international standards of civilized conduct. Surely an act which would be properly punishable even in the context of a declared war or in the heat of open military conflict cannot and should not receive recognition under the political exception to the Treaty.

*Matter of the Requested Extradition of Joseph Patrick Thomas Doherty*, 599 F.Supp. 270, 274 (S.D.N.Y.1984). The Court need not address at this time whether political offense exceptions in United

---

**22.** To the extent that respondent attempts to impugn Israel's motives by alleging that extradition for "murder" is sought merely as a subterfuge for trying an individual for political

crimes, this question is a matter left to the Executive Branch's discretion. *Eain v. Wilkes*, 641 F.2d 504, 516 (9th Cir.1981).

States extradition treaties are to be interpreted as broadly as the *Doherty* court construes the exception. Nonetheless, it is clear that even this very inclusive definition of "political offense" does not include the crimes charged against Demjanjuk. The crimes alleged are inconsistent with international standards of civilized conduct. *Supra* at 555.

The murdering of numerous civilians while a guard in a Nazi concentration camp, as part of a larger "Final Solution" to exterminate religious or ethnic groups, is not a crime of a "political character" and thus is not covered by the political offense exception to extradition. *Accord Artukovic*, slip op. at 6–7; *Doherty*, 599 F.Supp. at 274; *see also* Genocide Convention, Art. VII.

## CONCLUSION

Pursuant to 18 U.S.C. § 3184, this Court certifies to the Secretary of State:

that the respondent, John Demjanjuk, the person who was brought before this Court, is the one named in the Israeli Extradition Request;

that the charges of "murder" contained in the Request to Issue Warrant of Arrest and the Warrant of Arrest are extraditable offenses pursuant to Articles II and III of the Treaty; and

that competent and sufficient evidence has been presented to sustain the charges of "murder" against respondent as set forth in the Request to Issue Warrant of Arrest and the Warrant of Arrest.

The bond granted to Demjanjuk by a United States Magistrate on November 18, 1983 is hereby revoked. Pursuant to 18 U.S.C. § 3184, respondent John Demjanjuk shall be committed to the custody of the United States Attorney General forthwith, pending the issuance of a Warrant of Surrender by the Secretary of State.

Surrender to the State of Israel is stayed until May 1, 1985 at 10:00 a.m. D.S.T. to afford respondent the opportunity to apply for whatever relief he deems appropriate.

IT IS SO ORDERED.